## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

RANBAXY LABORATORIES INC.,

       Plaintiff,                              Case No. 3:13-CV-859-J-32TEM

v.

FIRST DATABANK, INC.,

       Defendant.

_____/

### DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT

      Defendant First Databank, Inc. hereby moves to dismiss Plaintiff Ranbaxy Laboratories Inc.'s Complaint under Rule 12(b)(2), (3), and (6), on the grounds that Plaintiff has failed to allege a prima facie showing of personal jurisdiction, has failed to allege facts that support laying of venue in this District, and has failed to allege facts that if accepted would state a plausible claim for relief as a matter of law.

### INTRODUCTION

      This case seeks to subjugate a publisher's right to publish accurate information concerning prescription drugs to a drug manufacturer's desire to maximize profits.  Plaintiff Ranbaxy Laboratories Inc. ("Ranbaxy") alleges that defendant First Databank, Inc. ("FDB") publishes false, incomplete, and misleading information about Ranbaxy's acne medication Absorica, which is causing pharmacists to substitute prescriptions for Absorica with other drugs containing the same active ingredient, Isotretinoin.  The entire case is founded on the FDA's publication of a rating that indicates that there is insufficient evidence to find that Absorica is therapeutically equivalent to these other drugs even though it is pharmaceutically equivalent.  Ranbaxy claims that FDB's information is contrary to the FDA's rating, when in fact it is exactly

the same.  Ranbaxy challenges FDB's accurate characterization of Absorica as pharmaceutically equivalent to the other Isotretinoin products, which Ranbaxy suggests implies therapeutic equivalence.  But Ranbaxy intentionally omits that FDB's publication exactly mirrors the FDA's conclusions about Absorica with respect to these distinct concepts.  In fact, FDB's publication repeats no less than four times the FDA rating reflecting Absorica's lack of therapeutic equivalence, which is the exact opposite of the alleged implication.  But Ranbaxy is not satisfied with FDB's accurate reporting – it wants to mute any indication of pharmaceutical equivalence with any other drug, even though true, in order to capture greater market share.

There are numerous problems with Ranbaxy's complaint.  As an initial matter, this case has no apparent connection to Florida and Ranbaxy has not plead a prima facie case of personal jurisdiction, as it is a New Jersey entity (notwithstanding its contrary representations in the Complaint) suing a California publisher.  And lacking jurisdiction, venue is likewise improper.

On the merits, Ranbaxy's claim of trade libel is deficient as a matter of law for numerous reasons and should be dismissed.  Ranbaxy cannot point to any false information published by FDB, as FDB's publication mirrors the information published by the FDA that Ranbaxy cites as being correct.  In addition, Ranbaxy cannot rely on any false implication from this true information, as a false implication based on true facts cannot form the basis of a trade libel claim as a matter of law, and the suggested implication is both unreasonable and expressly negated by the very information at issue.  And even if Ranbaxy could allege falsity, FDB's accurate report of the FDA statements in the Orange Book is protected by the fair report privilege.  Moreover, Ranbaxy cannot plausibly allege that FDB acted with malice or intended to convey any false information, where FDB publishes information directly contrary to the implication suggested by Ranbaxy.  In any event, whether drugs are therapeutically equivalent is exactly the sort of

subjective, scientific judgment that courts have found to be protected opinion.  Finally, Ranbaxy

has failed to allege special damages with particularity and cannot plausibly allege that FDB's

publication proximately caused any injury.  Ranbaxy's claim of tortious interference suffers from

the same defects as the trade libel claim (and some others discussed below) and should be

dismissed with it.

FDB publishes accurate information to assist pharmacists in exercising their own

professional judgment in accordance with the state laws governing drug substitution.  FDB

publishes information showing that Absorica is <u>pharmaceutically equivalent</u> to other drugs,

which some states require pharmacists to consider, along with information showing that the FDA

has <u>not</u> determined that it is <u>therapeutically equivalent</u> to those drugs, which other states require

pharmacists to follow or consider.  This is the same information published by the FDA.  What

Ranbaxy is asking this Court to do is require FDB to cease publication of the former information

that does not serve Ranbaxy's business interests.  But to do so would deprive pharmacists of

relevant information, contravene the states' economic policies and determinations of what

information should be considered in substitution decisions, and violate FDB's First Amendment

right to publish truthful information.  This case should be dismissed.

## <u>STATEMENT OF ALLEGATIONS AND RELEVANT FACTS</u>

### A.    **FDB's Publication**

FDB is a California publisher of pharmaceutical drug information and a subsidiary of the

diversified media company Hearst Corporation.  Among its publications, FDB publishes

MedKnowledge, which is a database publication concerning prescription drugs.  *See* FDB

MedKnowledge, Overview, http://www.fdbhealth.com/fdb-medknowledge-overview/ (last

visited Sept. 5, 2013).  Subscribers to MedKnowledge include hospitals, pharmacies, third-party

payors and other entities that use drug information.  *See* Complaint ¶ 4.  The database consists of

product information – such as the names, manufacturers, and product-identifying information for drugs; clinical information – including interactions between different drugs and information that can be provided to patients; and pricing information.  *Id.*

Licensed pharmacists may consult information from MedKnowledge in deciding whether to substitute one drug for another when filling a prescription in a manner consistent with their professional judgment and governing regulations.  Complaint ¶ 22; *see also infra* at 11-13.

> **B.**     **The Challenged Information**

This case concerns Ranbaxy's drug Absorica, which contains the active ingredient Isotretinoin (also found in generic versions of the drug Accutane) and is used to treat severe acne.  The sum and substance of Ranbaxy's complaint is that FDB has falsely characterized Ranbaxy's drug Absorica as a multi-source drug, and has published incomplete information that suggests to pharmacies that Absorica is therapeutically equivalent to other Isotretinoin drugs that may be substituted for it.  Complaint ¶¶ 23-27.  This suggestion is inaccurate in numerous ways and entirely misleading.  As explained below, FDB publishes the exact information that the FDA has published regarding Absorica, upon which the Complaint is founded – that Absorica is a multi-source drug (with pharmaceutical equivalents) but also that it has not been found by the FDA to be therapeutically equivalent to those other products.

> **1.**     ***Pharmaceutical and Therapeutic Equivalence***

The concepts of pharmaceutical and therapeutic equivalence that underlie this dispute have their origins in the FDA's Orange Book publication.  U.S Dep't of Health & Human Services, Food & Drug Administration, Approved Drug Products with Therapeutic Equivalence Evaluations (33d ed. 2013), http://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-

gen/documents/document/ucm071436.pdf (the "Orange Book").[1]  The Orange Book "identifies

drug products approved on the basis of safety and effectiveness by the Food and Drug

Administration (FDA) under the Federal Food, Drug, and Cosmetic Act" and "contains

therapeutic equivalence evaluations for approved multisource prescription drug products."  Ex. C

at iv.[2]  Reflecting a two-step analysis, the Orange Book groups products together that are

pharmaceutically equivalent as discussed below, and then provides ratings as to whether

pharmaceutically equivalent drugs – i.e., multi-source drugs – have been demonstrated in the

FDA's view to be therapeutically equivalent.  Id. at vi-vii.

---

[1]       The facts outside the Complaint cited here are all incorporated by reference in the Complaint and central to
it.  See Brooks v. Blue Cross & Blue Shield of FL, Inc., 116 F.3d 1364, 1369 (11th Cir. 1997) ("[W]here the plaintiff
refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court
may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's
attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for
summary judgment."); Horsley v. Feldt, 304 F.3d 1125, 1135 (11th Cir. 2002) (finding news article that formed
basis of defamation claim to be incorporated by reference); Maxcess, Inc. v. Lucent Techs., Inc., No. 6:04-cv-204-
Orl-31DAB, 2005 WL 6125471, at *4 (M.D. Fla. Jan. 5, 2005) ("[T]he agreement is central to Maxcess' claims in
the sense that it is an objective point of reference from which the Court may determine the facial, legal validity of
Maxcess' claims.") (citing Harris v. Ivax Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) (considering press release
providing context for allegedly fraudulent statement)); see also Tierney v. Vahle, 304 F.3d 734, 738 (7th Cir. 2002)
(noting the concern that, absent consideration of such material, "a plaintiff could evade dismissal under Rule
12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit"); 5A
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 1990) (noting that many
courts considering Rule 12(b)(6) motions "have allowed consideration of matters incorporated by reference or
integral to the claim, items subject to judicial notice, matters of public records. . .without converting the motion into
one for summary judgment").

       The documents incorporated by reference are: (1) the FDA Orange Book publication (cited at Complaint
¶¶16-17, 23), (2) FDB's database information regarding Absorica (cited and discussed throughout the Complaint),
(3) the parties' pre-suit correspondence (cited at Complaint ¶¶ 36-40, 42-45), (4) FDB's user documentation for its
MedKnowledge database (cited at Complaint ¶ 33 (as "boilerplate disclaimers" and an essential part of the
information at issue)), and (5) the Absorica product label (cited at Complaint ¶¶ 18-19).  The Orange Book and the
Absorica label are also public records over which the Court may take judicial notice, as are Ranbaxy's state
corporate filings.  See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999) (courts may consider
public records on a motion to dismiss).  To be clear, the Court need only consult the Orange Book and FDB's
published information, both of which are clearly referenced in the Complaint and are central to it, in order to dismiss
the case.  The other materials, however, are properly before the Court and make the implausibility of this case even
more clear as a matter of law.

[2]       The Exhibits cited herein are being filed concurrently with the Motion as part of the Declaration of Julie
Suko and the Declaration of Ravi V. Sitwala.  The Exhibits are consecutively lettered between the two filings, with
Exhibits A-B annexed to the Suko Declaration, and Exhibits C-H annexed to the Sitwala Declaration.  Citations
herein are directly to the Exhibits.

The Orange Book explains the concept of pharmaceutical equivalence as an objective four-factor analysis: "Drug products are considered pharmaceutical equivalents if they [1] contain the same active ingredient(s), [2] are of the same dosage form, [3] route of administration and [3] are identical in strength or concentration." *Id*. "Pharmaceutically equivalent drug products . . . may differ in characteristics such as shape, scoring configuration, release mechanisms, packaging, excipients (including colors, flavors, preservatives), expiration time, and, within certain limits, labeling." *Id.* at vii. Therapeutic equivalence, however, requires a further inquiry: "Drug products are considered to be therapeutic equivalents only if they are pharmaceutical equivalents <u>and</u> if they can be expected to have the same clinical effect and safety profile when administered to patients under the conditions specified in the labeling." *Id.* (emphasis added). "Therapeutic equivalence evaluations are a scientific judgment based upon evidence . . . ." *Id.* at xi.

The Orange Book makes plain that only multi-source drugs – those with pharmaceutical equivalents – are assigned Orange Book therapeutic-equivalence ratings:

> <u>FDA has evaluated for therapeutic equivalence only multisource prescription drug products</u> . . . , which in most instances means those pharmaceutical equivalents available from more than one manufacturer. For such products, a therapeutic equivalence code is included . . . . Those products with approved applications that are single-source (i.e., there is only one approved product available for that active ingredient, dosage form, route of administration, and strength) are also included on the List, but no therapeutic equivalence code is included with such products.

*Id.* at xi-xii (emphasis added).

The Orange Book code ratings fall into two basic categories – A-rated drugs, which are considered therapeutically equivalent by FDA, and B-rated drugs, which FDA have not determined to be therapeutically equivalent to other pharmaceutically equivalent drugs. *Id.* at xiii. Each rating also has a second character, which conveys additional information. *See generally id.* at xiii-xx. For purposes of this lawsuit, it is only relevant that a BX rating conveys

that there was insufficient data for FDA to determine therapeutic equivalence at the time of

publication, while the other B ratings generally convey that the FDA found a lack of therapeutic

equivalence based on pharmacological evidence.  *Id.*

The Orange Book is publicly available for no charge including on the FDA's website,

both in its full text form and as an interactive tool to look up particular drugs.

## 2.    *The FDA's Determinations Regarding Absorica*

The FDA determined that Absorica is one of several pharmaceutically equivalent brands

of Isotretinoin.  The Orange Book entry for Isotretinoin drugs including Absorica is as follows:

| ISOTRETINOIN | | | | | |
|---|---|---|---|---|---|
| CAPSULE; ORAL | | | | | |
| **AMNESTEEM** | | | | | |
| AB | MYLAN | 10MG | A075945 | 001 | Nov 08, 2002 |
| AB + | | 20MG | A075945 | 002 | Nov 08, 2002 |
| AB + | | 40MG | A075945 | 003 | Nov 08, 2002 |
| **CLARAVIS** | | | | | |
| AB | BARR | 10MG | A076356 | 001 | Apr 11, 2003 |
| AB | | 20MG | A076135 | 002 | Apr 11, 2003 |
| AB | | 30MG | A076135 | 003 | May 11, 2006 |
| AB | | 40MG | A076135 | 001 | Apr 11, 2003 |
| **MYORISAN** | | | | | |
| AB | DOUGLAS PHARMS | 10MG | A076485 | 001 | Jan 19, 2012 |
| AB | | 20MG | A076485 | 002 | Jan 19, 2012 |
| AB | | 40MG | A076485 | 003 | Jan 19, 2012 |
| **SOTRET** | | | | | |
| AB | RANBAXY | 10MG | A076041 | 001 | Dec 24, 2002 |
| AB | | 20MG | A076041 | 002 | Dec 24, 2002 |
| AB | | 30MG | A076503 | 001 | Jun 20, 2003 |
| AB | | 40MG | A076041 | 003 | Dec 24, 2002 |
| ABSORICA | | | | | |
| BX | CIPHER | 10MG | N021951 | 001 | May 25, 2012 |
| BX | | 20MG | N021951 | 002 | May 25, 2012 |
| BX | | 30MG | N021951 | 003 | May 25, 2012 |
| BX | | 40MG | N021951 | 004 | May 25, 2012 |

Ex. C at 3-237.[3]  This table reflects that Absorica is assigned a "BX" rating for therapeutic

equivalence.  *See also* Complaint ¶17.  This shows that the FDA has classified Absorica as

---

[3]    As explained in the Complaint, Absorica was actually developed by the company Cipher and Ranbaxy
purchased the rights to market it in the United States, which is why the Orange Book listed the license applicant as
Cipher.  Complaint ¶ 9.  Notably, as reflected, Ranbaxy also marketed one of the generic Isotretinoin drugs, Sotret.
The current supplement to the Orange Book now lists Ranbaxy as the applicant for Absorica and no longer lists
Ranbaxy's Isotretinoin drug Sotret.  U.S Dep't of Health & Human Services, Food & Drug Administration,
Approved Drug Products with Therapeutic Equivalence Evaluations, Supp. 7, July 2013 (33d ed. 2013),
http://www.fda.gov/downloads/Drugs/InformationOnDrugs/UCM086233.pdf.  The reason for Sotret's removal may
relate to the fact that earlier this year, Ranbaxy and its corporate affiliates agreed to pay $500 million in criminal and
civil penalties as part of a plea/settlement.  U.S. Dep't of Justice, Generic Drug Manufacturer Ranbaxy Pleads Guilty
and Agrees to Pay $500 Million to Resolve False Claims Allegations, cGMP Violations and False Statements to the
FDA, http://www.justice.gov/opa/pr/2013/May/13-civ-542.html (May 13, 2013).

multi-source, as FDA only assigns therapeutic equivalence ratings to multi-source drugs.  *See also id.* at xi-xii; *id.* at 2-1 ("If a prescription drug product is available from more than one source (multisource), a therapeutic equivalence code will appear in front of the applicant's name."); *id*. at xv ("Multisource drug products listed under the same heading (i.e., identical active ingredients(s), dosage form, and route(s) of administration) . . . ."); *id.* at illustration 2.2 (same).  The table also shows that the FDA has determined that the other four brands of Isotretinoin (Amnesteem, Claravis, Myorisan and Sotret) are all therapeutic equivalents (based on their AB ratings), in contrast to Absorica, for which there was insufficient data for the FDA to determine whether it too is therapeutically equivalent, leading to the presumption that it is not (and its BX rating).

For the sake of comparison to a single-source drug not at issue here, the first two entries in the Orange Book are copied below:

```
ABACAVIR SULFATE
   SOLUTION; ORAL
      ZIAGEN
      +  VIIV HLTHCARE        EQ 20MG BASE/ML                    N020978  001  Dec 17, 1998
   TABLET; ORAL
      ABACAVIR SULFATE
AB     APOTEX INC            EQ 300MG BASE                       A201570  001  Dec 17, 2012
AB     AUROBINDO PHARMA LTD  EQ 300MG BASE                       A077844  001  Dec 17, 2012
AB     MYLAN PHARMS INC      EQ 300MG BASE                       A091294  001  Jun 18, 2012
      ZIAGEN
AB  +  VIIV HLTHCARE         EQ 300MG BASE                       N020977  001  Dec 17, 1998
```

*Id.* at 3-1.  Here, the FDA determined the solution form of Abacavir Sulfate to be single source and so there is no Orange Book code rating in the table, while the tablet form is multi-source and those products are both pharmaceutically and therapeutically equivalent according to the FDA.

### 3.     *FDB's Publication is Entirely Accurate and Mirrors the FDA's Determinations Concerning Absorica*

Like the FDA, FDB generally groups together pharmaceutical equivalents in MedKnowledge.  It does this by assigning them a single Clinical Formulation ID.  FDB bases its

8

determination of pharmaceutical equivalence on the same four factors as the FDA.  As FDB's

user documentation states, "[a] unique Clinical Formulation ID (GCN_SEQNO) is assigned to

each different combination of [1] ingredient(s), [2] strength, [3] dosage form, and [4] route of

administration for a drug formulation."  Ex. B at 2330.[4]  This definition mirrors the FDA Orange

Book definition quoted above for pharmaceutical equivalence.  Here, based on its labeling,

Absorica has the same four characteristics as all of the other products identified by the FDA

above – it has the same active ingredient (Isotretinoin), strength (10, 20, 30, or 40 mg), dosage

form (capsule), and route of administration (oral).  *See, e.g.*, Orange Book, Ex. C at 3-237

(showing identical characteristics).  Accordingly, they have the same Clinical Formulation ID.

*See* Ex. A (showing same Clinical Formulation ID for Isotretinoin drugs with same strength).[5]

As discussed, this follows the FDA's application of the same criteria, which led it to the same

determination of pharmaceutical equivalence.

FDB's single- versus multi- source field simply reflects whether there is more than one

product in a given Clinical Formulation ID.  As FDB's user documentation states, the "Multi-

Source/Single Source Indicator" field "specifies whether a product's clinical formulation . . . is

only available from a single labeler or from multiple labelers."  Ex. B at 2843.  This, too, is

consistent with the Orange Book approach and led FDB to make the same determination as the

FDA – Absorica is a multi-source product.  *Id.*; Ex. A (showing indicator as 1, which is defined

as multi-source).

---

[4]     FDB has attached relevant excerpts from the MedKnowledge documentation.  FDB has offered to make the entire documentation available to opposing counsel pursuant to an appropriate protective order (a draft of which has been provided for review) and is prepared to submit it to the Court under seal if the Court so desires.

[5]     Exhibit A shows FDB's published information regarding Absorica along with the other Isotretinoin drugs, which is the information directly at issue in this case.  Depending on the software pharmacists use to view the information, it may be displayed in different ways.  As one court has recognized, FDB does not exercise control over that process and is not responsible for it.  *Schering Corp. v. First Databank Inc.*, No. C 07-01142, 2007 WL 1068206, at *7 (N.D. Cal. Apr. 10, 2007).

Alongside the pharmaceutical equivalence information for Absorica, FDB also publishes the FDA Orange Book Code in at least three fields (OBC, OBC3, and OBC_EXP).  Ex. B at 2930, 2934, 2937-38.  FDB accurately reports that Absorica received a BX rating.  Ex. A (showing all fields as "BX").  And to simplify the rating for its subscribers, FDB also publishes a field called the "Therapeutic Equivalence Indicator (GTI)."  This field is "a one-character alphanumeric column specifying a product's Orange Book code status."  Ex. B at 2368.  For Absorica, this field has a "1" value, which correctly indicates that Absorica is an "*Orange Book* B-rated drug product."  *Id.*; Ex. A.

In short, FDB publishes the exact information that the FDA has published in the Orange Book regarding Absorica (and that Ranbaxy cites as the "correct" information in the Complaint, Complaint ¶¶ 16-17) – that Absorica is a multi-source drug (with pharmaceutical equivalents) but also that it has not been found by the FDA to be therapeutically equivalent to the other products in its category.

### 4.    *Ranbaxy Willfully Conflates Pharmaceutical and Therapeutic Equivalence*

In order to gin up a basis for filing its Complaint, Ranbaxy purposefully conflates the concepts of pharmaceutical equivalence and therapeutic equivalence and egregiously omits key information within its knowledge from the Complaint.

The foundational allegation in the Complaint claims:  "By assigning the same [Clinical Formulation ID] to Absorica and all other Isotretinoin-based products and by identifying Absorica as a 'multi-source' product, FDB falsely and incorrectly indicates to FDB Subscribers that Absorica is therapeutically equivalent to, and may be safely substituted for, other branded or generic Isotretinoin-based products."  Complaint ¶ 26.  As explained above, however, whether a drug is single-source or multi-source is solely a question of pharmaceutical equivalence.  Indeed,

only when a drug is found to be multi-source does the FDA even consider therapeutic equivalence.  Accordingly, FDB's identification of Absorica as a multi-source product in no way indicates anything about therapeutic equivalence as Ranbaxy claims.  Similarly, Ranbaxy's suggestion that Absorica has been classified by the FDA as single-source because its labeling states that it is not substitutable with other Isotretinoin drugs confuses therapeutic equivalence (which concerns substitutability) and pharmaceutical equivalence (which concerns whether drugs are single- or multi- source).  Complaint ¶ 18.  The FDA has clearly classified Absorica as a multi-source drug.

While Ranbaxy touts its Orange Book BX rating in the Complaint and concedes the primacy of the FDA's judgment on therapeutic equivalence, it purposefully omits that the FDA clearly distinguishes between pharmaceutical and therapeutic equivalence in the Orange Book and that <u>FDB publishes the FDA's Orange Book rating for Absorica not once but four times</u> – both the full rating in three ways and a shorthand numerical version.  Ranbaxy's omission of this critical information is glaring, given FDB's repeated explanation of this in response to Ranbaxy's pre-suit communications.  Ex. D at 2-3.

### C. Bases for Substitution Decisions

Ranbaxy's claimed damages are premised on its allegation that pharmacies are improperly substituting other Isotretinoin drugs for Absorica based on FDB's information.  In fact, drug substitution takes place within a heavily regulated environment and involves the professional judgment of licensed pharmacists, who are required by law to follow specific rules.[6] The particular rules are a matter of state law, as both the FDA and FDB explain in their publications and as Ranbaxy admits.  Complaint ¶¶ 22, 25; Orange Book at xi ("[G]eneric

---

[6]     Prescribing physicians may always ensure that a brand-name drug is dispensed as written without substitution by checking the appropriate box when writing the prescription.  *E.g.*, Fla. Stat. § 465.025(2)(b).

substitution may involve social and economic policy administered by the states, intended to reduce the cost of drugs to consumers."); *see U.S. Pharm. Corp. v. Trigen Labs., Inc.*, No. 1:10– cv–0544–WSD, 2011 WL 446148, at *5 (N.D. Ga. Jan. 27, 2011) ("State law governs how and when these [drug] substitutions may be or must be made.").

Some states allow substitution only when drugs are A-rated in the Orange Book, while others allow substitution when drugs are merely pharmaceutically equivalent (in the discretion of the pharmacist). *U.S. Pharm. Corp.*, 2011 WL 446148, at *5 ("Some states mandate that a pharmacist may only substitute a drug if the Orange Book indicates that it is therapeutically equivalent. In fewer than ten states, a generic need only be pharmaceutically equivalent (i.e., the drug has identical active ingredients, strength, and dosage form) in order to be substituted.") (citations and quotations omitted). *See also generally* Pharmacist's Letter, State Regulations on Generic Substitution (April 2009), at

http://pharmacistsletter.therapeuticresearch.com/pl/ArticleDD.aspx?nidchk=1&cs=&s=PL&pt=2 &segment=1186&dd=220901 (surveying state regulations and collecting citations).

Consistent with the varying requirements across states, FDB instructs its subscribers that they must follow governing laws and regulations when making substitution decisions, and that while the Clinical Formulation ID may be a starting point, it cannot be the full answer:

> Although the Clinical Formulation ID (GCN_SEQNO) can be used to develop a list of candidates for substitution, these candidates are only pharmaceutically equivalent; it is not sufficient to determine therapeutic substitutability.
>
> Any substitution process using the Clinical Formulation ID (GCN_SEQNO) must:
>
> • Include a check against Orange Book Codes
>
> • Provide for compliance with State Boards of Pharmacy regulations
>
> • Respect state formulary codes (if any)

- Provide opportunity for the exercise of best clinical judgment of the dispensing pharmacist

Ex. B at 150.  With regards to the Orange Book, FDB further explains:

> Products that have the same clinical formulation are not necessarily therapeutically equivalent.  In many states equivalent Orange Book ratings are required before a pharmacist can dispense an OBC rated equivalent formulation.  Refer to the Therapeutic Equivalence Indicator (GTI), . . . to determine whether a drug designated as multi-source is A-rated by the FDA (meaning the drug has therapeutically equivalent alternatives), or B-rated by the FDA (meaning the drug does not have therapeutically equivalent alternatives).

*Id.* at 177; *see also id.* at 488 ("Products that share the same GCN are not necessarily therapeutically equivalent or substitutable, as the substitutability of two drug products depends upon State Regulation.").

FDB publishes many pieces of information for pharmacists to refer to in making substitution decisions, including the Orange Book ratings (in four separate fields), the four factors underlying pharmaceutical equivalence, and the pharmaceutical equivalence determination itself (embodied by the Clinical Formulation ID).  FDB explicitly does not take a position on which indicators should be used in substitution decisions:  "FDB does not recommend [any particular indicator] for purposes of determining 'generic' status, but provides several indicators to meet a variety of needs."  *E.g.*, Ex. B at 2368.

## MEMORANDUM OF LAW

The Complaint suffers from numerous defects, all of which require dismissal.  As a threshold matter, Ranbaxy has not met is burden of pleading facts to support an assertion of personal jurisdiction over FDB and has also failed to establish venue.  In addition, Ranbaxy's allegations fail to state a claim upon which relief may be granted.

## POINT I
## RANBAXY HAS NOT ADEQUATELY PLEAD
## PERSONAL JURISDICTION OR VENUE

"The plaintiff bears the initial burden of alleging sufficient facts to make out a prima facie case of jurisdiction." *Marsar v. Smith & Nephew, Inc.*, No. 8:13–CV–1244–T–27TGW, 2013 WL 4413722, at *1 (M.D. Fla. Aug. 14, 2013).  Here, Ranbaxy appears to argue for general jurisdiction based on FDB's authorization to do business in Florida and designation of an agent for service of process coupled with its alleged marketing to Florida entities and publication of information to those entities.  Complaint ¶ 6.  Ranbaxy may also be asserting specific jurisdiction based on the alleged harm it is suffering in Florida, where it claims to be based.  *Id.*  Neither contention is sufficient.

An exercise of general jurisdiction is only constitutionally permissible where a defendant has contacts "so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *see also In re British Am. Ins. Co.*, NO. 09-31881-EPK, 09-35888-EPK, ADV 11-03118-EPK, 2013 WL 1881712, at *3 (Bankr. S.D. Fla. Apr 30, 2013) ("General personal jurisdiction is typically reserved for parties with a home base of operations in the forum.") (citing *Goodyear*), *adopted by* No. 12-81330-CIV, 2013 WL 2490233, at *1 (S.D. Fla. Jun 07, 2013).  As this Court has held, "registering to do business and appointing a registered agent in the state of Florida, without more, does not subject a foreign corporation to the general personal jurisdiction of the state for any and all unrelated actions."  *In re Farmland Indus., Inc.*, No. 3:05–CV–587–J–32MCR, 2007 WL 7694308, at *11-*12 (M.D. Fla. Mar. 30, 2007).  In addition, "[g]eneral jurisdiction has been found lacking even where a company had employees, agencies and salespeople regularly in the forum; where the company was qualified to do business in the forum; and where it regularly solicited business and derived more than 26% of its income from the forum."  *Associated*

14

*Transport Line, Inc. v. Productos Fitosanitarios Proficol El Carmen, S.A.*, 197 F.3d 1070, 1075

(11th Cir. 1999).  Under this standard, Ranbaxy's allegations that FDB is registered to do

business in Florida and that it derives substantial revenue from doing so are plainly insufficient

to give rise to general jurisdiction.

      An exercise of specific jurisdiction over a non-resident defendant comports with due

process only when "he has by his own purposeful conduct created a 'substantial connection' with

the forum state."  *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) (citing *Calder*

*v. Jones*, 465 U.S. 83 (1984)).  In the case of intentional torts, such as trade libel and tortious

interference, this requires application of the *Calder* effects test.  *See NR Media, Inc. v. Too Much*

*Media*, No. 06-3988 (JAP), 2008 WL 544670, at *4 (D.N.J. Feb. 26, 2008) (finding trade libel to

be an intentional tort to which the *Calder* test applies).  "The *Calder* effects test has three prongs:

1) intentional acts; 2) expressly aimed at the forum state; 3) causing injury, the brunt of which

must be felt in the forum state."  *Full Sail, Inc. v. Spevack*,  No. 6:03-cv-887-Orl-31JGG, 2003

WL 25277185, at *6 (M.D. Fla. Oct. 21, 2003).  In order to be expressly aimed at the forum

state, a publication must be specifically directed to that forum and not merely directed to a

national audience.  *Id.* ("[T]he targeted audience presumably exists throughout the entire United

States.  Plaintiff has submitted no evidence in contravention of that assumption.  For these

reasons, Plaintiff has not shown that the site is expressly aimed at a Florida audience and fails to

satisfy the *Calder* effects test."); *Bioheart, Inc. v. Peschong*, No. 13–60304–CIV, 2013 WL

1729278, at *4 (S.D. Fla. Apr. 22, 2013) (same); *Internet Solutions Corp. v. Marshall*, No. 6:07–

cv–01740–ACC–KRS, Slip Op. at *8-*11 (M.D. Fla. Sept. 30, 2010); *see also JB Oxford*

*Holdings, Inc. v. Net Trade, Inc.*, 76 F.Supp.2d 1363, 1367 (S.D.Fla.1999) (requiring "contacts

that tie the defendant to a particular state, not those that merely link with equal strength the

defendant to all states").

Ranbaxy's jurisdictional allegations suffer from two independent problems.  First, while

Ranbaxy represents in the Complaint that its principal place of business is in Jacksonville and

therefore that it is suffering economic injury here, that representation is flatly contradicted by

Ranbaxy's own public filings, which identify New Jersey as its principal place of business.

Exs. F-H.[7]  Accordingly, the brunt of the alleged injury in this case is not felt in Florida.  In

addition, Ranbaxy has not alleged any facts to support a finding that FDB expressly targeted its

speech at Florida.  Indeed, Ranbaxy's own allegations show that FDB's information is read

throughout the country.  Complaint ¶ 20; *see also id.* ¶ 22 (suggesting that FDB information is

consulted in every state).  Accordingly, Ranbaxy has not alleged facts to satisfy the *Calder* test.

Because Ranbaxy has not plead a prima facie case of personal jurisdiction, it cannot base

venue on FDB's presence in the state.  The only other basis for venue Ranbaxy alleges is that "a

substantial part of the events or omissions giving rise to this action occurred in this district."

Complaint ¶ 7.  This conclusory allegation is facially insufficient and also unsupported by any

allegations in the Complaint, which describes a nationwide publication emanating from

California.  *See Watson v. Cmty. Educ. Ctrs., Inc.*, No. 2:10–cv–00778–36SPC, 2011 WL

3516150, at*3-*4 (M.D. Fla. Aug. 11, 2011).  Accordingly, Ranbaxy has failed to adequately

plead personal jurisdiction and venue.

---

[7]        Counsel for FDB raised this contradiction with Ranbaxy's counsel, who said he would look into it.  But no explanation has been provided as of the time of this filing.  Sitwala Dec. ¶ 7.  Accordingly, this motion does not cite to Florida law, which has no connection to the case, although FDB is not aware of any material conflict with California or New Jersey law, one of which applies here, *see infra* note 8.  If Ranbaxy contends that Florida law is somehow applicable, FDB reserves the right to seek leave to reply to the contention.

## POINT II
## RANBAXY HAS FAILED TO STATE A CLAIM

Ranbaxy's Complaint includes two causes of action – trade libel and tortious interference with business relations – that are both predicated on Ranbaxy's allegation that FDB publishes false, misleading, and incomplete information concerning Absorica in characterizing it as a multi-source drug product.  Ranbaxy's claims fail for a variety of independent reasons, the foremost of which is that the information published by FDB is entirely correct and consistent with the FDA information in the Orange Book.

This Court is quite familiar with the Rule 12(b)(6) standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . .  In its inquiry, the reviewing court must draw on its judicial experience and common sense.

*Roberts v. Choate Const. Co.*, No. 5:11–cv–120–Oc–32TBS, 2011 WL 5006469, at *1 (M.D. Fla. Oct. 20, 2011) (quotations omitted; citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).  In addition:

> Although it must accept well-pled facts as true, the Court is not required to accept Plaintiffs' legal conclusions.  In evaluating the sufficiency of a plaintiff's pleadings, the Court should make reasonable inferences in the plaintiff's favor, but is not required to draw plaintiff's inference.  Similarly, unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of plaintiff's allegations.

*Lawrie v. The Ginn Companies, LLC*, No. 3:09–cv–446–J–32JBT, 2010 WL 3746725, at *2 (M.D. Fla. Sept. 21, 2010) (footnote, citations and quotations omitted).

The "duty to accept the facts in the complaint as true does not require [the Court] to ignore specific factual details of the pleading in favor of general or conclusory allegations.  Indeed, when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007); *Hialeah*

17

*Physicians Care, LLC v. Conn. Gen. Life Ins. Co.*, No. 13–21895–CIV, 2013 WL 3810617, at \*1

(S.D. Fla. July 22, 2013) (applying rule to documents referenced in a complaint).

## I.    Ranbaxy Cannot State a Claim for Trade Libel

Ranbaxy's main claim in this case is that FDB committed trade libel by describing

Absorica as a multi-source drug with pharmaceutical equivalents.  There are numerous legal

problems with this claim, the most fundamental being that Ranbaxy cannot as a matter of law

plausibly allege that FDB published any false statement, and absent falsity there can be no claim

for trade libel.  In addition, Ranbaxy cannot state a claim by implication, both because no such

claim is cognizable as a matter of law absent a false statement of fact, and because the suggested

implication is entirely implausible and explicitly negated by FDB's publication.  Even if

Ranbaxy could allege falsity, FDB's accurate report of the FDA Orange Book information would

be protected by the fair report privilege.  Further, Ranbaxy has not plausibly alleged the requisite

actual malice.  Independently, even accepting Ranbaxy's unreasonable claim that FDB implies

Absorica is therapeutically equivalent to other Isotretinoin drugs, therapeutic equivalence is a

scientific judgment, not a provable fact that can give rise to a trade libel claim.  Finally, Ranbaxy

has not adequately alleged special damages and cannot plausibly allege causation.

### A.    Ranbaxy Cannot Plausibly Allege that FDB Published Anything False

The central element of a trade libel claim is the publication of a false statement by

defendant about plaintiff's product or business. *See ComputerXpress, Inc. v. Jackson*, 93 Cal.

App. 4th 993, 1010 (Cal. Ct. App. 2001); *Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct.

App. Div. 2004).[8]  While trade libel borrows many concepts from defamation law, it is a far

---

[8]        Either California or New Jersey substantive law applies here, as Ranbaxy is based in New Jersey and any
pecuniary injury would be felt there, while FDB is based in California and the conduct at issue took place there. *See*
Restatement (Second) Conflict of Laws § 145 (listing place of conduct and place of injury as relevant factors).  This
memorandum cites to both states' law.  But even if New Jersey law were to apply, that would not mean that personal
jurisdiction is proper in New Jersey. *Shaffer v. Heitner*, 433 U.S. 186, 215 (1977).

more circumscribed claim because it concerns commercial interests rather than the more-hallowed personal reputation. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 529 F. Supp. 357, 361 (D. Mass. 1981) ("The tort of product disparagement, as distinguished from individual or corporate defamation, is a narrow cause of action."); Restatement (Second) of Torts § 623A cmt. g ("[T]he two torts protect different interests and have entirely different origins in history . . . .  From the beginning, more stringent requirements were imposed upon the plaintiff seeking to recover for [product disparagement]."). Like defamation, however, the question whether an allegedly false statement is actionable must be analyzed from the perspective of a reasonable member of the target audience of the statement. *See Morningstar, Inc. v. Superior Court*, 23 Cal.App.4th 676, 688 (Cal. Ct. App. 1994) (considering impact of publication on sophisticated reader of financial journal); *Leers v. Green*, 131 A.2d 781, 788 (N.J. 1957) (explaining that defamatory meaning is judged in the context of the recipients of the publication). In addition, the statement must be considered as a whole. *See Corman v. Blanchard*, 27 Cal. Rptr. 327, 332 (Cal. Ct. App. 1962); *Romaine v. Kallinger*, 537 A.2d 284, 288 (N.J. 1988).  It also must be considered in the broader context in which it was made, including "the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." *Baker v. Los Angeles Herald Examiner*, 42 Cal. 3d 254, 261 (Cal. 1986); *Lynch v. N.J. Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999).  Whether a given statement, from a reasonable target audience member's perspective when read in context and as a whole, is capable of conveying the defamatory meaning ascribed to it by a plaintiff is a question of law for the court. *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005) (affirming dismissal on "the threshold question of whether a statement is reasonably capable of sustaining" the meaning alleged by plaintiff); *Romaine*, 537 A.2d at 288 (same).

19

Here, Ranbaxy concedes that the target audience of FDB's speech is made up of licensed pharmacists who reference FDB's database.  *E.g.*, Complaint ¶¶ 22, 27, 29, 33.  A reasonable member of this audience is trained and fully familiar with FDB's database, the FDA's Orange Book, as well as the regulations and standards governing pharmacists.  *See, e.g.*, *Sandoz Pharma. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 229-30 (3d Cir. 1990) (explaining in false advertising context that "a target audience's special knowledge of a class of products is highly relevant to any claim that it was misled"); *Schering-Plough Healthcare Prods., Inc., v. Schwartz Pharma, Inc.*, 547 F. Supp. 2d 939, 943 (E.D. Wis. 2008) (applying *Sandoz* to audience consisting of "licensed pharmacists, buyers who are trained as pharmacists, and other individuals with significant experience in the pharmaceutical industry").

Ranbaxy attempts to support its trade libel claim by alleging that FDB published information that is "false, incomplete, and misleading."  None of these characterizations is remotely plausible – each is discussed in turn below.

### 1.    *Ranbaxy Does Not Identify Any False Statement*

The only purportedly false statement alleged by Ranbaxy is FDB's characterization of Absorica as a multi-source drug.  Complaint ¶ 24.  But in the FDA Orange Book publication relied upon by Ranbaxy in the Complaint, the FDA also identifies Absorica as multi-source.  The FDA and FDB both expressly define multi-source drugs as drugs for which there are multiple products that share the same active ingredient, strength, dosage form, and route of administration.  Ex. C at vi-vii; Ex. B at 2330, 2843.  It cannot be disputed (and Ranbaxy does not dispute) that Absorica shares all of these characteristics with the other Isotretinoin drugs in the table above.  For this reason, both the FDA and FDB have found Absorica to be pharmaceutically equivalent to those other products and, by definition, multi-source drugs.  *Id.*

Ranbaxy attempts a sleight of hand in alleging that Absorica is properly classified as a single-source drug because the FDA has <u>not</u> found Absorica to be <u>therapeutically equivalent</u> to the other Isotretinoin drug products and therefore deemed it not substitutable with those products.  Complaint ¶ 18.  This conclusion is simply incorrect.  The single-source/multi-source distinction is tied solely to pharmaceutical equivalence, not therapeutic equivalence.  As detailed above (and as explained twice to Ranbaxy's counsel before the filing of the misleading complaint in this action), therapeutic equivalence is an entirely separate concept from pharmaceutical equivalence.  *See U.S. Pharm. Corp.*, 2011 WL 446148, at *4 ("Pharmaceutical equivalence between two drugs <u>does not mean that the two drugs are therapeutically equivalent</u>, even though they have the same active ingredients in the same strength, dosage, and route of administration.") (emphasis added).  A drug is properly classified as single source by the FDA and FDB only when it has no <u>pharmaceutical</u> equivalent to which it can be compared to determine therapeutic equivalence, and so receives no Orange Book code rating.  Here, under the definitions employed by both the FDA and FDB, Absorica is a multi-source drug.  Ranbaxy's contrary contention is baseless and contradicted by the very FDA document on which the Complaint is founded.

Courts have unequivocally found that drugs that share the four pharmaceutical-equivalence factors with other drug products are properly characterized by FDB as multi-source drugs regardless of the FDA's finding of therapeutic inequivalence among those drugs.  *Id.* ("[A] drug database company only links [two drugs] if the two drugs have the same active ingredient, strength, dosage, and route of administration."); *Schering Corp. v. First Databank Inc.*, No. C 07-01142, 2007 WL 1068206 (N.D. Cal. Apr. 10, 2007).  In the latter case, Schering sued FDB for product disparagement and tortious interference (among other things) based on FDB's

assignment of the same Clinical Formulation ID (which was then known as a "generic code sequence number") to Schering's asthma inhaler and two other inhalers and the resulting designation of the Schering inhaler as multi-source in what was then known as the "generic indicator" field.  Schering, like Ranbaxy here, took issue with FDB's multi-source determination, citing the FDA's assignment of a BX Orange Book Code rating to its inhaler, indicating that it was not therapeutically equivalent to the other inhalers.  In rejecting Schering's motion for a preliminary injunction, the court found FDB's data to be entirely accurate:

> The NDDF database [the former name of MedKnowledge] . . . accurately reports that the products are pharmaceutically equivalent, that drugs with this clinical formulation are available from more than one manufacturer, and that the FDA presumes the drugs to be therapeutically inequivalent due to insufficient data.  These are all true facts that are conveyed by First DataBank.

*Id.* at *6.  The same is true here.

### 2.   *Ranbaxy's Omission Allegation Is Baseless and Egregious*

Ranbaxy also alleges that FDB's information concerning Absorica is "incomplete," presumably because it does not convey that Absorica was found by the FDA not to be therapeutically equivalent to other Isotretinoin product based on a lack of evidence.  Complaint ¶¶ 26-27.  But the actual incompleteness lies in Ranbaxy's misleading complaint, which emphasizes the importance of the FDA's Orange Book Code rating (*id.* ¶ 16), and then purposefully omits that FDB explicitly publishes the FDA rating alongside the other information concerning Absorica (in numerous fields).  *See also U.S. Pharm. Corp.*, 2011 WL 446148 ("The therapeutic equivalences published in the Orange Book are reported in the drug information databases [including FDB's MedKnowledge database], allowing pharmacists viewing a list of pharmaceutically equivalent drugs to also see which drugs the FDA has determined are therapeutically equivalent.").  Ranbaxy's decision to withhold this information from the Court in

its Complaint, after having been advised of it multiple times by FDB, reveals a lack of candor

that speaks directly to the merits of the claims they attempt to state.

When considering FDB's publication as a whole, as the Court must, it is beyond

implausible – and indeed outrageous – to claim that the publication omits that Absorica was

found by the FDA to be therapeutically inequivalent to the other Isotretinoin products.

### 3. *Ranbaxy Cannot Allege an Implication Claim as a Matter of Law*

Perhaps recognizing the complete lack of merit in its claim of falsity or omission,

Ranbaxy also claims that FDB publishes misleading information by implying that Absorica is

therapeutically equivalent and therefore substitutable with the other Isotretinoin drug products.

Complaint ¶¶ 26-27.  The basis for Ranbaxy's claimed implication is FDB's accurate

characterization of Absorica as being pharmaceutically equivalent to other Isotretinoin drug

products, as reflected in FDB's assignment of the same Clinical Formulation ID to Absorica and

the other Isotretinoin products and the resulting multi-source designation.  This implication claim

cannot succeed as (1) the law does not recognize claims of trade libel founded purely on implied

falsehood, and (2) it is entirely implausible that a reasonable reader of FDB's publication would

derive the suggested implication, especially where it is expressly negated by FDB's publication.

### a.   Trade Libel Claims Cannot Be Founded on Pure Implications

Trade libel claims may only arise from provably false statements.   A manufacturer

cannot impose liability for product disparagement based on an "implied, disparaging message" if

it is unable "to prove that statements made [in the publication] were false." *Auvil v. CBS 60*

*Minutes*, 67 F.3d 816, 822 (9th Cir. 1995) (discussing Washington law); *Films of Distinction,*

*Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1082 (C.D. Cal. 1998) (recognizing that

*Auvil* correctly states California law).  Simply put, no product disparagement claim exists for an

allegedly false implication if it is based on entirely true facts.  Indeed, in New Jersey, even in

personal libel claims, which are broader than trade libel, "there is no libel by innuendo of a public figure where the challenged communication is true." *De Falco v. Anderson*, 506 A.2d 1280, 1284 (N.J. Super. Ct. App. Div. 1986) (quotations omitted).[9]

The restriction of trade libel to affirmative falsehoods (in contrast to personal defamation, which some states permit based on implication) is consistent with the historic "disfavor" with which product disparagement claims are treated at common law, see 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure §1310 (2d. ed. Suppl. 2007), and the diminished state interest in remedying harm caused to merchants whose wares are disparaged, *see Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 516 A.2d 220, 226 (N.J. 1986) ("[T]he common law historically has held the interest in one's reputation as more worthy of protection than the interest of a business in the products that it makes."). American law reflects a high tolerance for vigorous debate about products in the marketplace, even more so when the debate involves speech by third parties rather than direct competitors, and thus courts do not lightly expand the scope of the product disparagement tort.

Accordingly, even if Ranbaxy could point to a plausibly false implication here, which it clearly cannot, its trade libel claim should be dismissed as a matter of law.

---

[9]     FDB is not aware of a single reported case permitting an implied trade libel claim to proceed. *See* Restatement (Second) of Torts § 623A (consistently referring to publication of "false statement"). While Ranbaxy may point to a decision from this District that suggested in a footnote that that an inference could serve as a basis for a claim of trade libel, that statement has no bearing here for several reasons. *Nat'l Numismatic Certification, LLC, v. Ebay, Inc.*, No. 6:08-cv-42-Orl-19GJK, 2008 WL 2704404, at *20 n.26 (M.D. Fla. July 8, 2008). Florida law, at issue in that case, is not applicable here, and the statement was in any event dictum as the court dismissed the trade libel claim for failure to allege special damages. Moreover, the court reasoned that because Florida <u>personal defamation</u> law allowed implication claims, they are also permitted in trade libel, citing only personal defamation cases as support. *Id.* at *19, *20 n.26 (citing *Belli v. Orlando Daily Newspapers, Inc.*, 389 F.2d 579 (5th Cir. 1967) and *Fortson v. Colangelo*, 434 F. Supp. 2d 1369 (S.D. Fla. 2006)). But, as explained above, defamation and trade libel are distinct torts serving different interests, and the latter is a much narrower tort. More to the point, neither New Jersey nor California law permits a claim for trade libel where there is no false statement of fact involved.

b.      **FDB Does Not Imply Therapeutic Equivalence and
in Fact Expressly States that the FDA Has Found
No Such Equivalence**

Even in defamation, where implication claims are sometimes permitted, whether a

publication considered in context and as a whole is capable of conveying a false implication is a

question of law for the court.  *MacLeod v. Tribune Publ'g Co.*, 343 P.2d 36, 41-42 (Cal. 1959);

*Romaine*, 537 A.2d at 293.  The court must assess whether a suggested implication is reasonable

from the viewpoint of a reasonable member of the target audience.  *McGarry v. Univ. of San

Diego*, 154 Cal. App. 4th 97, 116 n.12 (Cal. Ct. App. 2007).  In addition, there can be no

implication claim when the very publication at issue negates the alleged implication.  *See, e.g.*,

*Price v. Stossel*, 620 F.3d 992, 1004 (9th Cir. 2010); *Schoff v. York County*, 761 A.2d 869, 872

(Me. 2000); *Nichols v. Moore*, 477 F.3d 396, 402 (6th Cir. 2007).  Ranbaxy's allegation that

FDB implies Absorica is therapeutically equivalent with the other Isotretinoin products has no

basis in FDB's actual statements about the products, either read individually or taken as a whole

and in context.  Indeed, the very information about which Ranbaxy complains explicitly states

that the FDA has <u>not</u> found therapeutic equivalence.

The only implication that one could reasonably take from FDB's assignment of the same

Clinical Formulation ID to Absorica and the other Isotretinoin products with the same strength is

that the drugs are pharmaceutically equivalent.  The same is true for the multi-source

designation, which simply implies the existence of pharmaceutical equivalents.  There is no basis

for a reasonable pharmacist to equate pharmaceutical equivalence with therapeutic equivalence.

Indeed, the publicly available Orange Book, which Ranbaxy recognizes as the primary authority

on therapeutic equivalence and with which a reasonably trained pharmacist would be familiar,

clearly defines and distinguishes the two concepts and explains that pharmaceutical equivalence

is merely the first step in a therapeutic equivalence determination.  Ex. C at vi-vii.  Likewise,

FDB's documentation, with which a reasonable pharmacist using FDB's information would be acquainted, clearly states that: "Products that have the same clinical formulation are not necessarily therapeutically equivalent." Ex. B at 177. Moreover, FDB publishes the FDA Orange Book Code rating that indicates that Absorica is not considered by the FDA to be therapeutically equivalent to other Isotretinoin drugs. This clearly negates any possible implication to the contrary as a matter of law.[10]

Considering this exact issue in *U.S. Pharmaceutical*, the Northern District of Georgia emphatically rejected a manufacturer's claim that FDB's linking of two drugs as pharmaceutically equivalent implied therapeutic equivalence:

> When [plaintiff] USPC's Supplements are searched for in the database, they are linked to Trigen's Supplements, and results for both are returned, because their linking indicates, at most, that they are pharmaceutically equivalent. The databases, by their nature and function, do not represent that the supplements are therapeutically equivalent.

*U.S. Pharm. Corp.*, 2011 WL 446148, at *5 (emphasis added); *id.* ("[N]either Trigen nor the database companies have made nor are they making any representation about therapeutic equivalence. When First DataBank links two supplements, it simply is representing that they are pharmaceutically equivalent . . . .") (quotation and alteration omitted); *id.* at *12 ("The drug database companies only list drugs as therapeutically equivalent if the FDA publishes a finding of therapeutic equivalence in the Orange Book. The database link therefore implies only what the evidence shows to be true, and nothing more: that the two companies' supplements have the

---

[10]     In addition, FDB also instructs its readers to consult the FDA's Orange Book when making substitution decisions, and stresses that "[t]he final decision to substitute must also include a review of State Board of Pharmacy regulations relative to drug substitution and the dispensing pharmacist's best professional judgment." Ex. B at 188; *see also id.* at 150, 177. Accordingly, it is absurd to suggest that FDB implies that Absorica is therapeutically equivalent or substitutable with other Isotretinoin drugs.

same active ingredients, strength, dosage, and route of administration.").[11]  Similarly, in

*Schering*, the court held Schering's claims unlikely to succeed on the merits, finding that the

information published was clearly accurate and rejecting Schering's attempt to ground its claims

in a false implication from the true information.  *Schering*, 2007 WL 1068206, at *7.  In

particular, the court rejected Schering's arguments that FDB could be liable for pharmacies'

misinterpretation of FDB's true publication or pharmacies' potentially misleading presentation of

FDB's information to their pharmacists as FDB has no control over that conduct.  *Id.*[12]

---

[11]      *U.S. Pharmaceutical* involved a Lanham Act false advertising claims by one manufacturer against another alleging that the defendant manufacturer's representations to FDB (among others) caused the drugs to be linked in FDB's database thereby implying therapeutic equivalence.  Unlike trade libel, the Lanham Act claim has been held to encompass false implications, *U.S. Pharm. Corp.*, 2011 WL 446148, at *7, but even if false implications could support trade libel claims, there is no such implication here as a matter of law for the same reasons explained in *U.S. Pharmaceuticals*.

[12]      The court subsequently entered an order denying FDB's special motion to strike the case under California's Anti-SLAPP statute.  No. C 07-01142, 2007 WL 1176627, at *10 (N.D. Cal. Apr. 20, 2007).  That order focused primarily on whether the Anti-SLAPP statute applied to the claims at issue and found (incorrectly) that it did not based on choice-of-law principles.  But the court also went on to note in passing that it would not have stricken the claims under its reading of the Anti-SLAPP statute standard, which only required claims to have "minimal merit" to survive a motion to strike.  *Id.* at *9.  Indeed, the court took pains to find only that Schering's "claim of falsity – while perhaps not likely to succeed – is not frivolous."  *Id.* at *10.  FDB sought mandamus review of the decision, which was not consistent with the same court's prior decision denying Schering's request for a preliminary injunction and contrary to law both as to the applicability and application of the Anti-SLAPP statute.  The district court refused to dismiss the appeal finding that it had at least some merit, No. C 07-01142, 2007 WL 1747115 (N.D. Cal. June 18, 2007), and the Ninth Circuit echoed this by immediately staying the proceedings and refusing to dismiss the appeal while keeping the stay in place, No. 07-72455, 2007 WL 5189859 (9th Cir. June 22, 2007); Nos. 07-15895, 07-72455, 2007 WL 5189858 (9th Cir. Aug. 27, 2007).  Ultimately, while on appeal, the case was dismissed based on a settlement, which did not involve any payment or change in FDB's challenged information.
      This Court should not read the dictum regarding the merits of Schering's claims in the district court's Anti-SLAPP order as having any precedential value here as compared to the far better reasoned (and non-dictum) discussion in the order denying the preliminary injunction for many reasons.  First, the Anti-SLAPP order did not alter the court's prior finding of no actual falsity, but rather allowed an implication claim under New Jersey law to proceed without even discussing the precedent rejecting trade libel claims based purely on implication.  It is clear that under New Jersey or California law, one of which applies here, no such claim exists.  Second, the court applied a standard of review that appears to fall well below the later-established plausibility standard for 12(b)(6) motions that should be applied here (and also below the now-settled burden on an Anti-SLAPP motion, *see Taus v. Loftus*, 151 P.3d 1185, 1205 (Cal. 2007)).  Finally, the order is entirely inconsistent with the later-decided *U.S. Pharmaceutical* case, which is the only other case FDB is aware of considering the issue.  *U.S. Pharmaceutical* thoroughly explains why no reasonable pharmacist could find any implication regarding therapeutic equivalence – let alone a false one – from a finding of pharmaceutical equivalence.

In sum, the allegedly false implication on which Ranbaxy's claim is founded is unreasonable as a matter of law, directly and expressly negated by the very information at issue, and has been rejected by multiple courts.

### B.      FDB's Statements Are Protected by the Fair Report Privilege

Even if Ranbaxy could plausibly allege that FDB's statements concerning Absorica are false (which it cannot), they would still be protected from liability by the fair report privilege, as they accurately convey the FDA's conclusions regarding the drug.  The fair report privilege protects fair and accurate reports or abridgements of official records or proceedings, regardless of whether the underlying information from the record or proceeding is correct.  *See generally* Cal. Civ. Code Ann. § 47(d); *Salzano v. North Jersey Media Group Inc.*, 993 A.2d 778 (N.J. 2010).  The privilege applies with equal (if not more) force to trade libel claims as to defamation claims.  *See, e.g.*, *Peper v. Gannett Co. Inc.*, No. 2002061753, 2003 WL 22432409, at *2 (Cal. App. Dep't Super. Ct. Apr. 4, 2003) (unpublished); *eCash Techs., Inc. v. Guagliardo*, 127 F.Supp.2d 1069, 1082-83 (C.D. Cal. 2000); *see also Seal Tite Corp. v. Bressi*, 712 A.2d 262, 265 (N.J. Super. Ct. App. Div. 1998) (recognizing that privileges in defamation have been applied to trade libel); *Zagami, LLC v. Cottrell*, 957 A.2d 691, 699 (N.J. Super. Ct. App. Div. 2008) (finding trade libel claim shielded by defamation privilege).  Here, because FDB has accurately conveyed the FDA's findings about Absorica in the Orange Book, the fair report privilege bars Ranbaxy's trade libel claim.

### C.      Ranbaxy Has Not Alleged Facts to Support Actual Malice

Another essential element of a trade libel claim is actual malice.  *Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1362 (Cal. Ct. App. 1998); *Patel*, 848 A.2d at 835.  *See generally* Restatement (Second) of Torts § 623A (requiring knowledge of falsity or reckless disregard to truth of statement).  This requirement flows not only from the common law elements of the

28

claim, but also from the constitutional actual malice requirement for claims seeking to impose liability for speech about a matter of public concern.[13]  *Durando v. Nutley Sun*, 37 A.3d 449, 458-59 (N.J. 2012) (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988)).  In order to satisfy the actual malice requirement, a plaintiff must show that the defendant knew that the statements at issue were false or acted in reckless disregard to the truth.  *Id.*

Furthermore, when a false implication is alleged to arise from literally true statements, a cause of action cannot be based on the implication unless the publication on its face indicates that the publisher "intended to convey the defamatory implication."  *See Dodds v. ABC*, 145 F.3d 1053, 1063-64 (9th Cir. 1998); *MacLeod v. Tribune Publ'g Co.*, 343 P.2d 36, 41 (Cal. 1959); *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 764 (D.N.J. 1981).

Here, Ranbaxy's allegations do not plausibly permit any inference that FDB knew its statements were false – to the contrary, the allegations show that FDB continues to believe that its information is entirely correct.  Complaint ¶¶ 39, 45.  Moreover, a reasonable reader of FDB's statements could not conclude that FDB intended to communicate that Absorica is therapeutically equivalent to any other Isotretinoin drugs when FDB in fact states the opposite.  *See Schering*, 2007 WL 1068206, at *6.  For these reasons, too, Ranbaxy cannot state a claim.

### D.    Scientific Judgments Regarding Therapeutic Equivalence Are Classic Opinion Not Susceptible to Libel Claims

Even if FDB's publication could somehow be read to imply that Absorica is therapeutically equivalent to other Isotretinoin products (which it cannot when read in context by a reasonable reader), such a statement would be a protected opinion about the efficacy of drug

---

[13]    Here, Ranbaxy's claims are founded on FDB's speech concerning a matter of public interest.  *Rivera v. First DataBank, Inc.*, 187 Cal. App. 4th 709, 716-17 (Cal. Ct. App. 2010) (finding FDB clinical information to concern a matter of public interest and noting that information concerning drug equivalence also pertains to matter of public interest) *cf. Sorrell v. IMS Health Inc.*. 131 S. Ct. 2653, 2659 (2011) ("Speech in aid of pharmaceutical marketing . . . is a form of expression protected by the Free Speech Clause of the First Amendment.").

therapies.  This presents an independent ground on which to dismiss the trade libel claim, as

statements of opinion, which are not provably false, cannot form the basis of a claim.

*ComputerXpress, Inc.*, 93 Cal. App. 4th at 1011 ("[O]pinions will not support a cause of action

for trade libel."); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972-73 (3d Cir. 1985) (rejecting

product disparagement claim because "[t]he issues discussed in the broadcast were matters of

public concern, the facts disclosed were true and the program adequately disclosed the basis for

the opinions expressed").

      Whether drugs are similar enough to be substitutable reflects a medical and

pharmacological judgment that is classic opinion.  As the FDA itself explains in the Orange

Book, "[t]herapeutic equivalence evaluations are a scientific judgment based upon evidence."

Ex. C at xi.  Ranbaxy, in other words, would be asking the Court to resolve a difference of

scientific opinion – precisely the kind of dispute the law places beyond the ken of courts and

juries.  As Judge Easterbrook explained in *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir.

1994) (citation omitted):  "Scientific controversies must be settled by the methods of science

rather than by the methods of litigation.  More papers, more discussion, better data, and more

satisfactory models – not larger awards of damages – mark the path toward superior

understanding of the world around us."  *See also Gorran v. Atkins Nutritionals, Inc.*, No. 05 Civ.

10679, 2006 WL 3586267, at *9 (S.D.N.Y. Dec. 11, 2006) ("'[A]ny unnecessary intervention by

the courts in the complex debate and interplay among the scientists that comprises modern

science can only distort and confuse.'") (citation omitted); *Auvil v. CBS 60 Minutes*, 836 F. Supp.

740, 743 (E.D. Wash. 1993) (entering summary judgment in product disparagement case based

on news report that pesticide might cause cancer since inconclusive science made it impossible

for plaintiff to prove falsity of defendant's conclusions), *aff'd*, 67 F.3d 816 (9th Cir. 1995).

Particularly where the FDA has stated that there is insufficient data to reach a definitive conclusion about therapeutic equivalence one way or the other, as here, FDB – and others in the medical field – must, as a matter of settled constitutional law, be entitled to express an opinion on the question.[14]

### E. Ranbaxy Does Not Adequately Plead Special Damages and Cannot Plausibly Allege Causation

A plaintiff alleging trade libel must plead special damages, which are the "natural and direct result of the false publication." *Atl. Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1035 (Cal. Ct. App. 2002); *Patel*, 848 A.2d at 248-49. These special damages must be plead with specificity under the strict requirements of Rule 9. Fed. R. Civ. P. 9(g). In order to meet this standard, a plaintiff must identify specific customers or sales lost or at least trace a definite loss of market share to the defendant's false publication (and exclude other causes). *Atl. Mut. Ins. Co.*, 100 Cal. App. 4th at 1035; *Patel*, 848 A.2d at 249; *Nat'l Numismatic Certification, LLC, v. Ebay, Inc.*, No. 6:08-cv-42-Orl-19GJK, 2008 WL 2704404, at *19-*20 (M.D. Fla. July 8, 2008) (discussing special damages requirement under Rule 9 and rejecting claim).

Here, Ranbaxy claims without support that "[a]s a direct result of FDB's false, misleading and incomplete statements about Absorica to FDB Subscribers, pharmacies are mistakenly substituting and filling prescriptions for Absorica with the Isotretinoin-based products of other manufacturers and distributors, causing Ranbaxy to lose sales and market share to its competitors." *E.g.*, Complaint ¶ 59. This is plainly insufficient under the applicable heightened pleading standard – it neither identifies lost sales nor any particular lost market share.

---

[14]  The only basis Ranbaxy has identified for why its drug should not be substituted is that it has shown in a small 14-person study that it absorbs better without food than other Isotretinoin drugs. Ex. E at 8, 12.3 (cited at Complaint ¶¶ 18-19). The same study showed, however, that Absorica, like other Isotretinoin drugs, has better absorption with food, so that for a person who can take the medication with meals, there is apparently no difference between the drugs. *Id.*

Moreover, given the extensive legal framework governing prescription substitution decisions and pharmacists' independent professional responsibility, FDB's publication of the information at issue cannot be said to have proximately caused the alleged injuries as a matter of law.  In many states, pharmacy regulations require pharmacists to adhere to the Orange Book recommendations and prohibit substitution of drugs with B ratings.  Any substitution of Absorica with another Isotretinoin drug in these states would be illegal and FDB as a matter of law cannot be held responsible for this illegal conduct.  *See Bridges v. Parrish*, 742 S.E.2d 794, 796-97 (N.C. 2013) (affirming dismissal on motion to dismiss:  "The criminal acts of a third party are generally considered unforeseeable and independent, intervening causes absolving the defendant of liability.") (internal quotation marks and citations omitted); *Whitfield v. Heckler & Koch Co.*, No. EC023122, 1998 WL 1769748, at *26 (Cal. Superior Feb. 26, 1998) (dismissing claim on motion to dismiss and refusing to hold firearm manufacturer liable for police officer's injuries from being shot by manufacturer's weapon when third-party criminal activity was supervening act breaking chain of proximate cause).  In non-Orange Book states, pharmacists are under a professional and legal duty to exercise their judgment in determining whether to substitute one pharmaceutically equivalent drug for another.  *See U.S. Pharm. Corp.*, 2011 WL 446148, at *5. In these states, there is nothing improper about substituting a different Isotretinoin drug for Absorica and FDB's publication of accurate information that may be considered when pharmacists exercise their independent professional judgment cannot plausibly be found to cause any given substitution, whether proper or not.  Even if Ranbaxy's bald claim that pharmacists are blindly abdicating their professional responsibility and improperly interpreting FDB's information were accepted, that would suggest that it is the pharmacists' misconduct that is harming Ranbaxy, not FDB's publication of accurate information.  *See, e.g., Brandt v. Burns*,

441 Fed. Appx. 924, 927 (3d Cir. 2011) (unpublished) ("[W]e agree with the District Court that it was appropriate to resolve the issue of proximate causation as a matter of law. . . . [W]e agree that the apparent mishandling of the Krol judge's order (by an actor or actors outside of the Appellees' control) and the subsequent release of Brandt by the Lakewood Township police constituted a superseding cause that broke the causal link between the Appellees' alleged conduct and the harm suffered by Brandt.").

Having failed to adequately allege special damages and being unable to plausibly allege legal causation, Ranbaxy's trade libel claim must be dismissed.

## II. Ranbaxy's Tortious Interference Claim Is Defective as a Matter of Law

Ranbaxy alleges that FDB tortiously interfered with Ranbaxy's business relations with pharmacies.  As an initial, but dispositive matter, because speech-based tortious interference claims may not be founded on true speech, the claim falls with the trade libel claim because there is no false speech here.  *See Schering*, 2007 WL 1068206, at *8 ("That Schering has not shown the falsity of First DataBank's information is also potentially fatal to this claim. Schering is unlikely to prevail on its tortious interference claim."); *see also Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057-58 (9th Cir. 1990) (explaining that "claims for . . . tortious interference with [a] business relationship . . . are subject to the same first amendment requirements that govern actions for defamation," including the burden of proving falsity; *see also* Restatement (Second) of Torts § 772, cmt. b ("There is of course no liability for interference with … a prospective contractual relation on the part of one who merely gives truthful information to another."); *E. Penn Sanitation, Inc. v. Grinnell Haulers, Inc.*, 682 A.2d 1207, 1218 (N.J. Super. A.D. 1996) ("[I]t is generally recognized that a party may not be held liable for tortious interference for merely providing truthful information to one of the contracting parties.").

In addition, in order to state a claim for tortious interference, Ranbaxy must plausibly allege that FDB's publication of the information at issue was wrongful or malicious.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003); *see also MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996).  In contrast to actual malice, this common-law malice requires the challenged conduct to be "inflicted intentionally and without justification or excuse."  *See MacDougall*, 677 A.2d at 174 (quotations omitted).  Here, FDB's conduct consists of publishing truthful information of legitimate public concern; FDB does not compete with Ranbaxy and has no motive to inflict injury on it; and the interests advanced by FDB are the timely and accurate dissemination of information concerning prescription drugs.  Ranbaxy alleges no specific facts that would, if proven, establish that FDB acted with improper motives or that its conduct is independently wrongful in any respect.  *Schering Corp.*, 2007 WL 1068206, at *7 ("Schering has failed to present evidence that would establish either 'malice' or conduct 'wrongful by some legal measure other than the fact of interference itself.'  Schering does not offer evidence of intent by First DataBank to interfere with any of Schering's prospective customers.  First DataBank is not even in competition with Schering.  In short, Schering has not offered facts to establish that First DataBank's conduct was 'both injurious and transgressive of generally accepted standards of common morality or of law' or that the interference by First DataBank was not 'sanctioned by the rules of the game.'").

In addition, claims of tortious interference based on speech must meet the First Amendment actual-malice requirement.  *Unelko Corp.*, 912 F.2d at 1057-58; *Durando*, 37 A.3d at 458 ("[T]he actual-malice standard applies to all speech-based torts involving matters of public concern or public officials.").  Here, no such malice is plausible.  *See supra* at 28-29.  Ranbaxy must also allege facts that plausibly give rise to an inference that the alleged

34

publication actually caused the interference claimed.  *See Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391-94 (Cal. Ct. App. 2004); *Patel*, 848 A.D.2d at 831-32.  It has not done so for the same reasons that causation fails as a matter of law for trade libel.  *See supra* at 31-33.

For these reasons, Ranbaxy cannot prevail on its claim for tortious interference.

## <u>CONCLUSION</u>

For the foregoing reasons, FDB respectfully requests that Plaintiff's Complaint be dismissed with prejudice, and that the Court grant FDB such other relief as it deems just.

Respectfully submitted,

by: ____/s/ Jennifer A. Mansfield_____
Timothy J. Conner
Florida Bar No. 767580
Jennifer A. Mansfield
Florida Bar No. 0186724
HOLLAND & KNIGHT LLP
50 North Laura Street, Suite 3900
Jacksonville, Florida 32202
Telephone:  904-353-2000
Facsimile:  904-358-1872
Timothy.conner@hklaw.com
jennifer.mansfield@hklaw.com

Jonathan R. Donnellan (pro hac vice pending)
Ravi V. Sitwala (pro hac vice pending)
The Hearst Corporation
300 West 57th Street
New York, New York  10019
Telephone:  212-649-2020
Facsimile:  212-649-2035
jdonnellan@hearst.com
rsitwala@hearst.com

*Attorneys for Defendants*

Dated:  September 6, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of September, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will notify by electronic mail counsel of record noted below.

John A. DeVault, III
Michael E. Lockamy
Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
101 East Adams Street
Jacksonville, FL 32202
jad@bedellfirm.com
mel@bedellfirm.com


_s/ Jennifer A. Mansfield_____