# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

RANBAXY LABORATORIES INC.,

       Plaintiff,

v.                                     Case No:   3:13-cv-859-J-32MCR

FIRST DATABANK, INC.,

       Defendant.

---

## O R D E R

Ranbaxy Laboratories, Inc. thinks its acne drug Absorica is one of a kind. After First Databank, Inc. published statements in its drug database that Ranbaxy believed falsely portrayed that Absorica is not unique, Ranbaxy sued for trade libel and tortious interference with business relations. (Doc. 1). FDB moved to dismiss the Complaint, arguing in part that its statements were not false. (Doc. 12). The Court denied the motion to dismiss but provided for an initial discovery period dealing only with the issue of falsity. (Doc. 61). FDB then moved for summary judgment, contending that its statements were not false (Doc. 73; Doc. 74; Doc. 79), and Ranbaxy responded (Doc. 80; Doc. 81; Doc. 82). The Court heard oral argument on April 24, 2015, and the transcript of that hearing is incorporated herein.

## I.    BACKGROUND FACTS

First Databank, Inc. ("FDB") publishes MedKnowledge, a database that contains clinical, pricing, and drug descriptor information on a variety of drug

products, including prescription drugs. (Doc. 74-6 at 2).[1] MedKnowledge contains thousands of fields of data. (Doc. 74-1 at 3). Because the data is not presented in a usable format, an end-user must either create their own software interface for the data or license software from a company that licenses the database. (Doc. 74-1 at 2). While large pharmacy chains sometimes create their own software to use the database, most smaller chains and independent pharmacies license software from a vendor that has, in turn, licensed MedKnowledge for use in its software.[2] (Doc. 74-1 at 2-3). Those vendors, presumably with input from the pharmacies, determine what information from the database should be displayed to pharmacists and how that information should be formatted. (Doc. 74-10 at 12 pg. 39). As such, pharmacists do not see the MedKnowledge database in its original form.

Amongst other reasons, users may seek to use MedKnowledge's data to discover drugs that are pharmaceutically or therapeutically equivalent. "Drug products are considered pharmaceutical equivalents if they contain the same active ingredient(s), are of the same dosage form, route of administration and are identical in strength or concentration . . . ." (Doc. 74-8 at 7-8). To be therapeutic equivalents, drugs must be pharmaceutical equivalents and they must "be expected to have the same clinical

---

[1] For ease of reference, all citations to the record reflect the docket page. Where a docket page contains multiple pages of a deposition, a second page number is added to reflect the deposition page number.

[2] Pharmacies are only one potential end-user of FDB's database. (Doc. 74-1 at 2). However, they are particularly important because Ranbaxy alleges that it has suffered damages because of the impact FDB's statements have had on pharmacies. (Doc. 1 at 11, 12).

effect and safety profile when administered to patients under the conditions specified in the labeling." (Doc. 74-8 at 8). Drugs that are therapeutic equivalents therefore can generally be substituted for each other.

One measure of therapeutic equivalence is found in the "Orange Book," published by the FDA. (Doc. 74-13 at 14 pg. 47-48). The Orange Book only evaluates "multisource prescription drug products" for therapeutic equivalence. (Doc. 74-8 at 12). In doing so, it provides a two letter code, with the first letter representing whether the drug is therapeutically equivalent to other products. (Doc. 74-8 at 14). Drugs with therapeutic equivalents have codes starting with an A, while drugs without therapeutic equivalents have codes starting with a B. (Doc. 74-8 at 14).

Ranbaxy manufactures Absorica, an isotretinon-based drug used to treat severe acne. (Doc. 81-1 at 3). Absorica is pharmaceutically equivalent to other isotretinoin-based medicines, such as Accutane. (Doc. 74-23 at 2). However, it does not have any therapeutic equivalents because it is more bioavailable than other isotretinoin-based medicines when taken during a fasted state (on an empty stomach). (Doc. 74-9 at 9). This means that, compared to another isotretinoin-based medicine when both are taken without food, Absorica allows more of the isotretinoin to be absorbed into the bloodstream. As such, the Orange Book gives Absorica a rating of BX (Doc. 74-8 at 30), meaning that there is not sufficient evidence to find that the drug has any therapeutic equivalents (Doc. 74-8 at 21). In some states, referred to as "Orange Book states," pharmacists are barred from substituting drugs that are not A-rated. (Doc. 74-13 at 7-8 pgs. 21-22). Other states, however, do not necessarily follow the Orange Book. (Doc.

74-13 at 8 pg. 22). Some of these "non-Orange Book" states may permit pharmacists to substitute other isotretinoin-based drugs for Absorica.

MedKnowledge reports Absorica's BX rating. (Doc. 74-7 at 2). [3] Its documentation also provides three different ways for users to check for therapeutic equivalents, each of which includes a check against the Orange Book codes. (Doc. 74-2 at 7-21). As such, any user following the instructions in the documentation would find that Absorica is not therapeutically equivalent to other drugs. (Doc. 74-13 at 25 pg. 90-91). However, MedKnowledge provides Absorica with the same Clinical Formulation ID as other isotretinoin-based drugs and lists Absorica as a "multi-source" drug. (Doc. 74-7 at 2). Ranbaxy's expert testified that, in non-Orange Book states, pharmacy practice management systems will display generic substitutes for products with the same Clinical Formulation ID that are listed as multi-source, thereby leading pharmacists to improperly substitute other drugs for Absorica. (Doc. 74-12 at 6). Thus, Ranbaxy claims that FDB's publication in MedKnowledge that Absorica has the same Clinical Formulation ID as other drugs and is "multi-source" is false and constitutes trade libel and tortious interference with business relations.

---

[3] Ranbaxy argues that Exhibit G (Doc. 74-7), which lists some of the information FDB publishes about isotretinoin-based drugs, "lacks authenticity and is entirely misleading." (Doc. 80 at 22). Ranbaxy takes issue with FDB's submission of such a small fraction of the information it publishes about Absorica, and complains that FDB never produced the rest of the information it publishes about Absorica. (Doc. 80 at 22). As Ranbaxy did not file a motion to compel on this issue, it will not be heard to complain about discovery in its response to FDB's summary judgment motion. While the information in Exhibit G is not necessarily presented in the form an end user might see (Doc. 74-11 at 20 pg. 70-71) and presents only a tiny portion of the information published about Absorica (Doc. 74-11 at 19 pg. 68), there is no reason to believe the data it contains is inaccurate.

## II.    LAW

### A.    Falsity

The parties disagree on the applicable law, with Ranbaxy contending that Florida law applies and FDB arguing that either California or New Jersey law applies. (Compare Doc. 73 at 18 n.3 with Doc. 80 at ii). In ruling on FDB's Special Motion to Strike, the Court found that the applicable substantive law for the purposes of that motion was the state of Ranbaxy's principal place of business, which is either Florida or New Jersey. 2014 WL 982742, at *5-6 (M.D. Fla. Mar. 12, 2014). The same principles underlying that decision likewise indicate that the law to be applied in ruling on summary judgment is Florida's or New Jersey's. The parties have provided no additional information regarding Ranbaxy's principal place of business. Ranbaxy cites almost exclusively to Florida law without explanation (Doc. 80) and FDB states in a footnote that California or New Jersey substantive law apply to the extent that the Court finds an actual conflict of law (Doc. 73 at 18 n.3).

Ranbaxy's claims are for trade libel and tortious interference with business relations. (Doc. 1 at 10-13). Under Florida and New Jersey law, trade libel requires the publication of a false statement. See Border Collie Rescue, Inc. v. Ryan, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006); Arista Records, Inc. v. Flea World, Inc., 356 F. Supp. 2d 411, 427 (D.N.J. 2005). Likewise, under both states' law, a party cannot be held liable for tortious interference where it provided truthful information. See Cherestal v. Sears Roebuck & Co., No. 6:12-CV-1681-ORL-28, 2014 WL 644727, at *4 (M.D. Fla. Feb. 19, 2014); E. Penn Sanitation, Inc. v. Grinnell Haulers, Inc., 294 N.J.

Super. 158, 180 (App. Div. 1996); <u>see</u> <u>also</u> Restatement (Second) of Torts § 772 (1979). As such, under either state's law, Ranbaxy's claims fail unless FDB's assignment of the same Clinical Formulation ID to Absorica and other drugs or designation of Absorica as multi-source are false.

In determining whether a statement is false, courts consider how a reasonable person would interpret it. <u>Senisch v. Carlino</u>, 423 N.J. Super. 269, 278 (App. Div. 2011); <u>see</u> <u>also</u> <u>Smith v. Cuban Am. Nat. Found.</u>, 731 So. 2d 702, 706 (Fla. Dist. Ct. App. 1999) (looking to the effect of the statement on the mind of the reader). The statement must be considered in the context of the publication, including the audience, the means by which it was delivered, and other circumstances surrounding the statement. <u>Fid. Warranty Servs., Inc. v. Firstate Ins. Holdings, Inc.</u>, 74 So. 3d 506, 515 (Fla. Dist. Ct. App. 2011); <u>see</u> <u>also</u> <u>Ward v. Zelikovsky</u>, 136 N.J. 516, 532 (1994). "The court has a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury." <u>Smith</u>, 731 So.2d at 704 (reversing a plaintiff's jury verdict on a defamation claim and remanding the case with instructions to enter judgment in favor of the defendant). However, summary judgment should be denied where the statement is "reasonably capable of a defamatory interpretation." <u>Saadi v. Maroun</u>, No. 8:07-CV-1976-T-24MAP, 2009 WL 1424184, at *3 (M.D. Fla. May 20, 2009); <u>see</u> <u>also</u> <u>Romaine v. Kallinger</u>, 109 N.J. 282, 290-91 (1988).

The parties appear to agree on this analysis. The sole disagreement on the law is FDB's contention that a trade libel claim cannot be based on an inference. (Doc. 73

at 21 n.5). FDB cites to <u>Auvil v. CBS 60 Minutes</u>, 67 F.3d 816 (9th Cir. 1995), which held that, under Washington law, a claim for product disparagement must be based on a false statement, not on an "overall message." 67 F.3d at 822. FDB contends that, to the extent that Florida law permits claims of trade libel by implication, there is a conflict of laws. (Doc. 73 at 21 n.5). However, there is no conflict here both because the Court does not read Florida law to permit a claim based on an "overall message" as opposed to a specific false statement, and because the claim at issue is based on two alleged false statements.[4] The Court will therefore look to the two statements at issue in context and determine whether they are reasonably capable of a defamatory interpretation.

### B.    The <u>Schering</u> Case

As the Court noted in its Order on FDB's motion to dismiss, this case is similar to a case brought by Schering Corporation against FDB, alleging that FDB disseminated false information about an asthma medication Schering manufactured. <u>See</u> <u>Schering Corp. v. First Databank Inc.</u>, No. C07-01142 WHA, 2007 WL 1068206 (N.D. Cal. Apr. 10, 2007). Schering's inhaler was pharmaceutically equivalent to other inhalers but was not therapeutically equivalent. <u>Id.</u> at *5. FDB reported the inhalers'

---

[4] FDB suggests that dicta in <u>Nat'l Numismatic Certification, LLC. v. eBay, Inc.</u>, No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404 (M.D. Fla. July 8, 2008) indicates that Florida law recognizes claims for trade libel based on inferences. (Doc. 73 at 21 n.5, citing 2008 WL 2704404 at *19, *20 n.26). The court in <u>Nat'l Numismatic</u> seemed only to indicate that context, including the implication a reasonable reader would take from the statement, is important in determining falsity. <u>See</u> 2008 WL 2704404 at *20 n.26. That is consistent with Florida and New Jersey law. To the extent that <u>Nat'l Numismatic</u> suggests that a plaintiff may bring a claim for an overall message of falsity, such a finding would not be relevant to this case.

BX rating. Id. at *2. However, it also assigned the inhaler the same Clinical Formulation ID as other inhalers and listed it as a multi-source drug. Id. at *3.

Schering moved to preliminarily enjoin FDB from publishing that information. Id. at *1. Schering argued that pharmacists interpreted those designations to mean that the inhalers were therapeutically equivalent. Id. at *6. However, the court found that nothing that FDB published stated that the products were therapeutically equivalent. Id. at *5. Instead, FDB "accurately reports that the products are pharmaceutically equivalent, that drugs with this clinical formulation are available from more than one manufacturer, and that the FDA presumes the drugs to be therapeutically inequivalent due to insufficient data." Id. at *6. In part because the truth of FDB's statements made Schering unlikely to succeed on the merits, the court denied Schering's motion for a preliminary injunction. Id. at *10.

Ten days later, the court considered FDB's motion to strike the complaint under California's anti-SLAPP statute. Schering Corp. v. First DataBank Inc., No. C 07-01142 WHA, 2007 WL 1176627, at *1 (N.D. Cal. Apr. 20, 2007). That statute provides a special procedural mechanism for striking causes of action shortly after the filing of a complaint and potentially before any discovery has occurred. See Cal. Civ. Proc. Code § 425.16 (West 2014). Where applicable, a plaintiff must establish a probability of success on the claim to survive the motion to strike. Id. The Schering court held that, under New Jersey choice of law rules, the California anti-SLAPP statute did not apply, and FDB's motion should therefore be denied. Schering, 2007 WL 1176627, at *8. The court then alternatively held that, even if the anti-SLAPP statute applied, the motion

to strike would still be denied because Schering demonstrated a reasonable probability of prevailing on its claims, meaning that a reasonable jury could find in its favor. <u>Id.</u> at *9. Of particular importance was testimony that pharmacists understood FDB's information to mean that Schering's inhaler was appropriately substitutable for other inhalers. <u>Id.</u> at *10. Schering's claim of falsity "while perhaps not likely to succeed" was not frivolous because the court could not determine as a matter of law that FDB's publication did not communicate that other inhalers were therapeutically equivalent to and substitutable for Schering's inhaler. <u>Id.</u>

Both parties point to <u>Schering</u> as persuasive authority, with FDB emphasizing the <u>Schering</u> court's denial of the motion for a preliminary injunction and Ranbaxy focusing on the court's denial of FDB's motion to strike. The <u>Schering</u> court's analysis in ruling on the motion for a preliminary injunction supports an understanding that FDB is not making a determination about therapeutic equivalence when it provides multiple drugs with the same Clinical Formulation ID or gives a drug a multi-source rating.[5] <u>See</u> 2007 WL 1068206 at *5. On the other hand, the <u>Schering</u> court's alternative holding, though issued without the benefit of discovery and in reliance upon an affidavit not in evidence here, cautions the Court to take seriously the contention that FDB's publication may be susceptible to a defamatory meaning.

---

[5] Notably, however, the motion for a preliminary injunction was decided on a standard more favorable to FDB than this motion for summary judgment.

### C.   Clinical Formulation ID

#### 1.   <u>FDB's Publication</u>

MedKnowledge provides a Clinical Formulation ID, also known as a GCN_SEQNO, for Absorica's 10 mg capsule (36045), 20 mg capsule (36046), 30 mg capsule (53055), and 40 mg capsule (36047). (Doc. 74-7 at 2). In each case, the Absorica capsule shares a Clinical Formulation ID with at least one other drug. (Doc. 74-7 at 2). FDB provides "user documentation" to its MedKnowledge customers, which explains the meaning of the terms used in the database. (Doc. 74-1 at 3). The documentation states that a Clinical Formulation ID "is specific to generic ingredient(s), drug strength(s), dosage form, and route of administration." (Doc. 74-2 at 22). Thus, drugs only have the same Clinical Formulation ID where they have the same active ingredient, drug strength (referring to the potency of the drug in metric units), dosage form (such as tablet or capsule), and route of administration (such as oral, injection, or topical). (Doc. 74-2 at 25).

The Clinical Formulation ID does more than merely parrot the FDA's determination of whether drugs are pharmaceutically equivalent. FDB's director of editorial services, Julie Suko, testified that, while products that the FDA considers pharmaceutically equivalent will generally have the same Clinical Formulation ID, FDB will create a new Clinical Formulation ID where "it's clinically necessary, clinical uniqueness is required . . . ." (Doc. 74-11 at 46 pg. 175). The MedKnowledge documentation states that determination of a dosage form is based on the delivery method, release mechanism, and "[c]linical uniqueness, including, but not limited to,

side effects, indications, contraindications[,] and conditions which may impact patient education and label warnings . . . . [N]ew dosage forms are added when the clinical uniqueness of a novel dosage form has been established." (Doc. 74-2 at 3).

For example, a February 1996 newsletter explained this distinction by presenting the example of two theophylline tablets that were assigned different Clinical Formulation IDs "because one of the products was approved for nocturnal asthma and must be taken between 6pm and 8pm, with dinner . . . [and] [t]he other theophylline product is taken in the morning and may be taken without regard to meals." (Doc. 74-25 at 4). The products were given different Clinical Formulation IDs because of the difference in the time of day at which they were to be taken, not because one drug needed to be taken with food and the other did not. (Doc. 74-11 at 28 pg. 102-103). However, FDB's readers may not have known that its database lacks a dosage form related to food (See Doc. 74-11 at 28 pg. 103), and so may have interpreted the newsletter to mean that the drugs were separated based in part on whether they needed to be taken with food.[6]

The MedKnowledge user documentation warns that giving two drugs the same Clinical Formulation ID "should not be understood to mean that they are therapeutically equivalent." (Doc. 74-2 at 22). Thus, while the Clinical Formulation ID "can be used to develop a list of candidates for substitution, these candidates are only

_____

[6] The newsletter said drugs can be given different Clinical Formulation IDs because of differences in administration or because they differ "significantly in any other clinical data (dosing, indications, side effects, etc) . . . ." (Doc. 74-25 at 4). It recommended that users use the Clinical Formulation ID "plus the Orange Book Code to identify possible generic equivalents." (Doc. 74-25 at 5).

pharmaceutically equivalent; it is not sufficient to determine therapeutic substitutability." (Doc. 74-2 at 5). Accordingly, users are instructed that, when using the Clinical Formulation ID to determine substitutability, they "*must* [i]nclude a check against Orange Book Codes" as well as provide for compliance with state laws. (Doc. 74-2 at 5). The documentation states that "FDB does not determine therapeutic equivalency . . . ." (Doc. 74-2 at 22). FDB's licensing agreements also contain a standard term requiring licensees to use reasonable commercial efforts to require end users to prominently display a drug's Orange Book code and, as long as commercially reasonable, the Therapeutic Equivalence Indicator whenever it displays or otherwise uses the Clinical Formulation ID as a tool for dispensing. (Doc. 74-1 at 4; see Doc. 79-15 at 9).

### 2. **Ranbaxy's argument**

FDB's documentation states that it creates a new dosage form "when the clinical uniqueness of a novel dosage form has been established." (Doc. 74-2 at 3).[7] In asking FDB to list Absorica as a single-source drug, Ranbaxy's Director of Customer Service and Contracts/Chargebacks mentioned that, while Absorica is not therapeutically equivalent to other drugs, it is pharmaceutically equivalent to other isotretinoin-based drugs because it has the "same drug, strength, dosage form and route . . . ." (Doc. 74-23 at 35) (emphasis added). In making the same request, Ranbaxy's senior brand manager likewise referred to Absorica as pharmaceutically equivalent to other

---

[7] As an example of different kinds of dosage forms, regular tablets are given the dosage form "TA", whereas chewable tablets are given the code "TC." (Doc. 74-11 at 23 pg. 82).

isotretinoin-based drugs because it has the "same drug, strength, <u>dosage form</u> and route . . . ." (Doc. 74-23 at 41) (emphasis added).

Nevertheless, Ranbaxy asserts that FDB's assignment of the same Clinical Formulation IDs to Absorica and other drugs "falsely indicates that Absorica is not clinically unique." (Doc. 80 at 9). Inconsistent with its prior communications with FDB, Ranbaxy now asserts that Absorica requires a different dosage form, and therefore a different Clinical Formulation ID, because it is clinically unique in that it "is specially formulated to be therapeutically effective when taken without food, while other isotretinoin products require high fat meals to be effective."[8] (Doc. 80 at 5). FDB's Suko admitted that differences in absorption between products taken in the fed or fasted state qualify as "clinical data" in the commonly understood usage of the phrase. (Doc. 74-11 at 27).

But FDB has never used differences in a drug's performance when taken with or without food to create a unique Clinical Formulation ID. (Doc. 74-11 at 18-19 pg. 65-66). Indeed, none of the fields in MedKnowledge, including the dosage form, inform the reader whether a drug has to be taken without food. (Doc. 74-11 at 22). In considering "clinical uniqueness" FDB looks to its clinical modules, specifically "side effects, indications, dosing, [and] contraindications." (Doc. 74-11 at 21 pg. 76). None of those relate to whether a product has to be administered with food. (Doc. 74-11 at 21 pg. 77).

---

[8] Ranbaxy does not dispute that Absorica has the same main ingredient, strength, and route of administration as other isotretinoin-based drugs.

While that may establish that Absorica should not be given a unique dosage form under FDB's practices, it does not necessarily decide whether the assignment of the same Clinical Formulation ID to Absorica as to other drugs is susceptible to a defamatory interpretation. To answer that question, the Court must look to the database itself and the documentation. The documentation makes clear that the determination of dosage form depends on the drug's delivery method, release mechanism, and "[c]linical uniqueness, including, but not limited to, side effects, indications, contraindications[,] and conditions which may impact patient education and label warnings . . . ." (Doc. 74-2 at 3). No reasonable reader would understand any of those criteria to relate to whether a drug should be taken with food.

In lieu of any evidence that FDB tells readers it creates new dosage forms for drugs based on whether they should be taken with food, Ranbaxy's argument seems to be that a reasonable reader could understand FDB's statement that it provides a new dosage form when "clinical uniqueness" requires to mean that it provides a new dosage form whenever a drug does not have a therapeutic equivalent.[9] In support of this argument, Ranbaxy argues that seven "MEDITCH Customer Connection" newsletters sent between March 2013 and February 2014 suggest that drugs with the

---

[9] At oral argument, the Court asked Ranbaxy's counsel how it could know that the other drugs with the same Clinical Formulation ID as Absorica lack "significant clinical differences" that would also require them to have unique Clinical Formulation IDs. Ranbaxy's counsel said that if they had significant clinical differences, they would not be AB-rated (meaning the Orange Book would not have rated them therapeutically equivalent), effectively admitting that his argument was based on the premise that the assignment of the same Clinical Formulation ID to multiple drugs indicates they are therapeutically equivalent.

14

same Clinical Formulation ID are identical in all ways. (Doc. 80 at 11-12; <u>see</u> Doc. 81-9; Doc. 81-10; Doc. 81-11; Doc. 81-12; Doc. 81-13; Doc. 81-14; Doc. 81-15). As an initial matter, it is not clear that these newsletters, sent to only some of FDB's customers (specifically hospitals (Doc. 74-11 at 31 pg. 117)) should be considered in determining the truth or falsity of a separate publication. Even assuming the newsletters should be considered, however, they help, rather than hinder FDB's case.

The newsletters state that a Clinical Formulation ID "can be used to identify [drugs] with the same Ingredients, Strengths, Dosage Forms, and Routes."[10] (Doc. 81-9 at 5). Thus, drugs with the same Clinical Formulation ID are "potential substitutions." (Doc. 81-9 at 6). While this language is consistent with the MedKnowledge documentation, Ranbaxy seizes upon one sentence, which states that "because FDB's Clinical Form[ulation] ID classification groups identical products under a shared numerical value (ID), users are able to easily identify a replacement [drug identification number] for a pharmaceutically substitutable product." (Doc. 81-9 at 6). Asked about this sentence by itself, Suko admitted that it was not complete and was "misleading in the whole." (Doc. 74-11 at 31 pg. 116). Indeed, on its own, the sentence could be understood to mean that drugs with the same Clinical Formulation ID are identical in all respects. In context, however, the statement indicates that drugs with the same Clinical Formulation ID are identical as to the characteristics measured in a Clinical Formulation ID, which are listed on the previous page in that same

---

[10] While other sections of the newsletters varied, the relevant portion is the same in each.

newsletter: ingredients, strength, dosage form, and route of administration. (See Doc. 81-9 at 5-6). No reasonable reader, having read a MEDITECH Customer Connection newsletter, would believe that drugs with the same Clinical Formulation ID are identical in all respects. Instead, the letters merely reflect the same definition for Clinical Formulation IDs found in the MedKnowledge documentation.

Ranbaxy next argues that Absorica's Clinical Formulation ID is false because customer inquiries indicate that FDB's customers understand drugs with the same Clinical Formulation ID to be therapeutically equivalent. MedKnowledge users may contact FDB with questions about the meaning of any data field in the database and about the proper ways to use data elements. (Doc. 74-1 at 4). Since Absorica was first listed in MedKnowledge in November 2012, FDB has received over 20,000 inquiries from customers about the database. (Doc. 74-1 at 4-5). Just five of those questions dealt with Absorica's substitutability.

First, Cardinal Health asked whether Absorica should "be in the same GCN[11] as the other Isotretinoin since it is BX rated?" (Doc. 81-2 at 2). Second, McKesson Pharmacy Systems LLC asked why Absorica has "the same generic codes as Accutane" when the drugs are not equivalent. (Doc. 81-2 at 2). Third, McKesson indicated a customer was concerned that Absorica was linked to other isotretinoin-based drugs "in Enterprise Rx" even though the drugs are not substitutable. (Doc. 81-2 at 2). Fourth,

---

[11] The GCN is a less specific indicator than the Clinical Formulation ID (GCN_SEQNO). (Doc. 74-11 at 25 pg. 91). The GCN strictly aligns with the FDA's reporting of pharmaceutical equivalence. (Doc. 74-11 at 25 pg. 91; Doc. 74-13 at 20 pg. 71).

HP-Arkansas Medicaid said that it received "a provider inquiry" that it wanted to follow up on by asking whether Absorica should have the same GCN as other isotretinoin-based products considering that it is not bioequivalent to Accutane when taken without food. (Doc. 81-2 at 2). Fifth, AmerisourceBergen Drug Corporation stated that a customer was reporting that Claravis is not a substitute for Absorica, and asked FDB to verify that information and update the database accordingly if necessary.[12] (Doc. 81-2 at 2).

Interestingly, none of these inquiries refers to Absorica's Clinical Formulation ID. The questions do show both that some FDB customers understand that Absorica is not therapeutically equivalent to other drugs (which is true) and that they are uncertain as to how Absorica should be listed in MedKnowledge given that information. They do not, however, indicate that a reasonable reader interprets drugs with the same Clinical Formulation ID to be therapeutically equivalent.

Ranbaxy also objects to FDB's responses to the inquiries, calling them contradictory and misleading. (Doc. 80 at 12). FDB's responses to the customer inquiries are inconsistent. FDB told Cardinal Health that "Clinical Formulation

---

[12] As evidence that FDB's information about Absorica would cause pharmacists to improperly substitute other isotretinoin-based products for Absorica, Ranbaxy's expert called two pharmacies that use FDB information and, when he asked if he could get a substituted product for Absorica, they said yes. (Doc. 74-13 at 27 pg. 98). As Ranbaxy presents no evidence that the pharmacists ever considered information that used the FDB fields at issue, these examples are irrelevant. The pharmacists could have decided to substitute the drugs because they believed FDB to be saying the drugs were therapeutically equivalent, but they also may have interpreted FDB's information to mean the drugs were therapeutically inequivalent but disregarded that information, or may not have looked at information that used the fields at issue at all.

identity is not to be understood as a representation of pharmaceutical equivalence or substitutability . . . ." (Doc. 81-2 at 2). In responding to HP-Arkansas Medicaid, however, FDB said that it assigns products "to a Clinical Formulation ID (GCNSEQNO) or Formulation ID (GCN) . . . consistent with the FDAs definition of pharmaceutical equivalence in the Orange Book." (Doc. 81-2 at 2). FDB's responses are therefore unclear as to whether drugs with the same Clinical Formulation ID are even pharmaceutically equivalent. In response to each inquiry, however, FDB explained that it groups products by active ingredient, drug strength, dosage form, and route of administration, and that such a grouping does not mean that the drugs are interchangeable. (Doc. 81-2 at 2). None of FDB's responses suggested that Clinical Formulation IDs contained information about therapeutic equivalence.

MedKnowledge's user documentation expressly states that the assignment of the same Clinical Formulation ID to two products "should not be understood to mean that they are therapeutically equivalent." (Doc. 74-2 at 22). When testifying in other cases, FDB representatives have stated that the assignment of a Clinical Formulation ID is not a representation of therapeutic equivalence. U.S. Pharm. Corp. v. Trigen Labs., Inc., No. 1:10-CV-0544-WSD, 2011 WL 446148, at *12 (N.D. Ga. Jan. 27, 2011). Nowhere in the user documentation does FDB hint that a Clinical Formulation ID may be used to determine therapeutic equivalence. Instead, the documentation states that, in using the Clinical Formulation ID to find substitutes, users must also consider the Orange Book Code. (Doc. 74-2 at 5). When customers indicate confusion about Absorica's listing, FDB explains that the Clinical Formulation ID does not address

therapeutic equivalence. (Doc. 81-2 at 2). Ranbaxy's own expert acknowledges that the Clinical Formulation ID does not represent therapeutic equivalence. (Doc. 74-13 at 20 pg. 72). As such, no reasonable reader would interpret Absorica's shared Clinical Formulation ID to mean that it has therapeutic equivalents. Thus, as a matter of law, Absorica's Clinical Formulation ID is not "false."

### D.    Multi-source

MedKnowledge lists each version of Absorica as having a Multi-Source/Single Source Indicator (NDCGI1) of 1. (Doc. 74-7 at 2). This means that Absorica is considered to be a multi-source drug under that categorization. (Doc. 74-2 at 6). The only information FDB publishes to explain the meaning of a multi-source designation is its user documentation. (Doc. 74-11 at 41). The documentation states that the Multi-Source/Single Source Indicator "specifies whether a product's *clinical formulation* (i.e., its particular active ingredient, dosage form, route of administration and strength) is only available from a single labeler or from multiple labelers." (Doc. 74-2 at 6). The documentation recommends that readers refer to the Therapeutic Equivalence Indicator for a determination of therapeutic equivalence, as it explains that "[p]roducts that have the same *clinical formulation* are not necessarily therapeutically equivalent." (Doc. 74-2 at 6). The Therapeutic Equivalence Indicator shows that Absorica is not therapeutically equivalent to other drugs. (Doc. 74-7 at 2).

Nevertheless, Ranbaxy contends that the reasonable reader could understand FDB's identification of Absorica as multi-source to indicate that the drug is therapeutically equivalent to other isotretinoin-based drugs. (Doc. 80 at 14). Ranbaxy

first contends that the reasonable reader cannot be expected to have read the user documentation because a DVD containing the documentation is only sent to subscribers upon request and the documentation is too long to read in any event. (Doc. 80 at 17). Despite Ranbaxy's arguments to the contrary, the documentation is easily accessible. There is no need for customers to request the documentation on disk form because it is available to all FDB customers through FDB's "online community." (Doc. 74-10 at 13 pg. 44). While the documentation is exceedingly long, so long, in fact, that FDB's corporate representative admitted she had never read it in its entirety and was not familiar with its full contents, (Doc. 74-11 at 20 pg. 72), the question is not whether a reasonable reader of the database would have read the entire documentation, but whether a reasonable reader who saw Absorica's multi-source indicator "NDCGI1:1" would also have looked up the portion of the documentation dealing with the multi-source designation and its meaning. That they could easily do, despite the length of the documentation, as a search for the term "multi-source" or "NDCGI1" quickly leads to the portion explaining what the indicator represents.[13]

Moreover, reference to the documentation is necessary to begin with for a reader to understand that the database is providing information about a drug's multi-source status. A reader looking at the database would only see something like "NDCGI1: 1" without any explanation of what that means. At oral argument, Ranbaxy's counsel

---

[13] The explanation of the Multi-Source/Single Source Indicator (NDCGI1) located on page 234 of the documentation is the eighth result for "multi-source" and sixth result for "NDCGI1." (Doc. 74-3). As such, readers should be able to find the information in, at most, a few minutes.

said that it was his "working assumption" that someone would see an NDCGI1 of 1 and know that that information meant the drug was multi-source. The only support he gave for that assumption, however, were the customer inquiries previously discussed, none of which mentioned an NDCGI1 or a multi-source designation.[14] (See Doc. 81-2 at 2). Nothing in the database suggests that an NDCGI1 is a multi-source indicator; a reader would have to refer to the documentation for that information. Even if a reader somehow knew that an NDCGI1 was a multi-source indicator without looking at the documentation, it would be easy to presume that a single-source drug has a value of 1 and a multi-source drug has a value of 2 (rather than the opposite). In other words, a reader would have to refer to the documentation to understand the basic information both parties agree FDB publishes in the database: that Absorica's NDCGI1 designation shows that it is a multi-source drug.

Ranbaxy next argues that the documentation acts as a mere disclaimer, which is insufficient to absolve a publisher of liability. (Doc. 80 at 17). A speaker may not necessarily absolve himself from liability for defamation by indicating that his previous statements may not be true. See Off Lease Only, Inc. v. Carfax, Inc., No. 12-80193-CV, 2012 WL 1966372, at *3-4 (S.D. Fla. May 31, 2012). However, as explained above, the documentation is not a mere disclaimer indicating that the published information may not be true, it is the only way for a reasonable reader to understand what the database means in the first place.

_____

[14] Even if they had referenced a multi-source rating, their inquiry would only be relevant on this point if they had not read the documentation before inquiring. There is no evidence about whether the inquirers read the documentation.

The heart of Ranbaxy's argument is its contention that the word "multi-source" has an established meaning in the pharmacy industry, by which definition Absorica is not multi-source. (Doc. 80 at 14-16). Ranbaxy's expert, Daniel Bruchwalski, testified that the term multi-source has a commonly understood meaning amongst pharmacists, who consider multi-source products to be therapeutically equivalent and substitutable. (Doc. 74-12 at 3). Because Absorica's FDA-approved prescribing information indicates that it is not interchangeable with other isotretinoin-based products, Bruchwalski believes that it is incorrect for FDB to list Absorica as multi-source. (Doc. 74-12 at 6).

Bruchwalski bases his belief in the established meaning of the term on his "experience in the industry and . . . understanding of how [multi-source] is used and understood in the industry." (Doc. 74-13 at 25 pg. 92). Asked if he could point to any support for his claim that his definition of multi-source was the commonly understood definition, he said, "Documented, no. But that's been the practice that I've understood in pharmacy practice management systems and the field for years." (Doc. 74-13 at 25 pg. 93).

Despite his insistence on the established meaning of the term multi-source, Bruchwalski admits that the FDA's Orange Book uses the term multi-source in a different way. (Doc. 74-13 at 25 pg. 93). Indeed, the FDA only evaluates for therapeutic equivalence "multisource prescription drug products . . . which in most instances means those pharmaceutical equivalents available from more than one manufacturer." (Doc. 74-8 at 12). Therefore, by evaluating Absorica for therapeutic

equivalence, the FDA indicated that Absorica is a multi-source drug. Thus, Ranbaxy simultaneously argues that the FDA's view on therapeutic equivalence and substitutability are so authoritative as to render its finding that Absorica has no therapeutic equivalent a "fact" and that the FDA is so out of touch that it uses a definition of multi-source that differs from the way the phrase is always used and understood in the field.

In support of Bruchwalski's definition, Ranbaxy cites to a number of uses of "multi-source" and "multiple source" in statutes, websites, and drug manuals, some of which use the term to mean that a drug has therapeutic equivalents and others of which define the term to mean a drug that is sold by two or more manufacturers. (See Doc. 80 at 15 n.7). Interestingly, some of these sources refer to the definition of multi-source or multiple source drugs in the context of rebates. See, e.g., 42 U.S.C. § 1396r-8(k)(7) (2012). FDB has a separate indicator, HCFA_DC, which deals with the rebate status of a drug as reported by the Centers for Medicare and Medicaid Services. (Doc. 74-6 at 2). Absorica has an HCFA_DC of "S" meaning that it is single source for the purposes of that field. (Doc. 74-6 at 2). Thus, FDB's reporting on this topic seems consistent with Ranbaxy's interpretation.

Nevertheless, though skeptical, because the Court must view all evidence in favor of the non-moving party at summary judgment, the Court assumes that "multi-source" is a term of art in the pharmaceutical industry, where it means that a drug is therapeutically equivalent to other drugs and is substitutable. But FDB's documentation makes clear that it does not employ that "conventional" definition, and

therefore does not use the term to mean that the drugs are therapeutically equivalent and substitutable. Bruchwalski agreed that FDB's documentation does not use his definition of multi-source. (Doc. 74-13 at 25 pg. 93). Any user who consulted the documentation, which he would have to do to learn what an NDCGI1 of 1 means, would see that the Multi-Source/Single Source Indicator does not show whether the drug is multi-source in Bruchwalski's "established" sense, but instead shows whether a product's clinical formulation is available from multiple labelers. (Doc. 74-2 at 6).

Further, MedKnowledge includes at least four indicators of whether a drug is multi-source or single-source, including the HCFA_DC in which Absorica is rated single source.[15] (See Doc. 74-3 at 234, 2490, 2530, 2884). Any reasonable reader who saw that Absorica was listed as both multi-source and single source would know that, at least with respect to one of the indicators, FDB was not using the "established" meaning of multi-source, else it was saying both that Absorica is substitutable and is not substitutable. The reasonable reader would also know that it would need to refer to FDB's documentation to understand how the term multi-source was being used in that particular instance.

A reasonable reader would be aware that Absorica is both rated single-source and multi-source, depending on the context, and that the documentation explains that the NDCGI1 does not indicate therapeutic equivalence. Therefore, even assuming that

---

[15] Besides the NDCGI1 and HCFA_DC, MedKnowledge also includes a GCNSEQ_GI which "differentiates single-source from multiple-source drugs" (Doc. 74-3, pg. 2490) and a MED-Reference Multi-Source Code, which is based off the NDCGI1 and indicates whether a drug is single-source or multi-source (Doc. 74-3, pg. 2884).

multi-source has the "established" meaning offered by Dr. Bruchwalski, no reasonable reader would understand Absorica's NDCGI1 of 1 to mean the drug is therapeutically equivalent to other isotretinoin-based drugs. As a matter of law, FDB's publication of Absorica's NDCGI1 of 1 is not reasonably capable of a defamatory interpretation.

## III.   CONCLUSION

The facts of this case are largely undisputed and, where they are not, the Court has viewed the evidence in the light most favorable to Ranbaxy. Given the undisputed content of the allegedly false publication, the Court has "a 'prominent function' in determining whether a statement is defamatory, and if a statement is not capable of a defamatory meaning, it should not be submitted to a jury." Smith, 731 So.2d at 704.

A more typical trade libel case involves a defendant's alleged false or disparaging statement about the quality of a competitor's product. See, e.g., Renaissance Health Pub., LLC v. Resveratrol Partners, LLC, 982 So. 2d 739 (Fla. Dist. Ct. App. 2008). This is not such a case. FDB gathers and publishes data on drugs, using the same criteria and definitions to categorize a wide variety of drugs. FDB's raw data is formatted by companies that wish to use the data or by third-party vendors. FDB's target audience consists of sophisticated users, such as pharmacies, hospitals, and third-party software vendors, well-versed in how to interpret such data (or to ask questions if they arise). See Fid. Warranty Servs., 74 So. 3d at 515 (instructing that a statement must be considered in context, including consideration of the intended audience). Using the criteria and definitions spelled out in its documentation, FDB provides Absorica with the same Clinical Formulation ID as

other isotretinoin-based drugs and lists it as multi-source. No reasonable reader of MedKnowledge's data would consider these statements "false" or "reasonably capable of a defamatory interpretation." <u>See</u> <u>Saadi</u>, 2009 WL 1424184, at *3.

Ultimately, this is just a disagreement between Ranbaxy and FDB about the proper characterization and placement of Absorica in the MedKnowledge database. But such a disagreement is not the stuff of a trade libel claim.[16]

Accordingly, it is hereby

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. 73) is **GRANTED**. The Clerk should enter judgment in favor of Defendant First Databank, Inc. and against Plaintiff Ranbaxy Laboratories Inc. and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 9th day of June, 2015.

TIMOTHY J. CORRIGAN
United States District Judge

w.
Copies to:

Counsel of record

---

[16] Like the trade libel claim, the tortious interference claim fails for absence of a false statement. <u>See</u> <u>Cherestal</u>, 2014 WL 644727, at *4. As both counts fail on that basis alone, the Court need not reach the First Amendment or other issues raised by this case.